**In the Matter of Attorney Robert J. SNYDER.**

**No. 84–8017.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1984.

Decided April 13, 1984.

Order Denying Petition for Rehearing En Banc May 31, 1984.

Robert J. Snyder, Bismarck, N.D., per se.

David L. Peterson, James S. Hill, Irvin B. Nodland, Patrick W. Durick, Robert P. Bennett, John C. Kapsner, Charles L. Chapman, Bismarck, N.D., for appellee.

Before LAY, Chief Judge, and HEANEY and ARNOLD, Circuit Judges.

LAY, Chief Judge.

This case comes before us on an order issued to attorney Robert Snyder of Bismarck, North Dakota, to show cause why he should not be suspended from practice in the federal courts. Attorney Snyder has been cited: (1) for his refusal to continue to perform services in indigent cases under the Criminal Justice Act (CJA) 18 U.S.C. § 3006A (1982); and (2) for his disrespectful refusal to comply with the guidelines under the CJA relating to the submission of expenses and attorney fees.

*Facts*

On March 14, 1983, Attorney Snyder was appointed by Judge Bruce Van Sickle of the District of North Dakota to represent an indigent defendant under the CJA. There is no issue concerning his services being performed competently. After the proceedings, pursuant to § 3006A(d)(4) of the CJA, Attorney Snyder submitted to the district court a claim for services and expenses in the amount of $1,898.55. On August 17, the district court judge reduced the claim by $102.50 and approved the modified request.

Under the CJA, the chief judge of this court must review and approve any expenditures for compensation in excess of the $1,000 limit. 18 U.S.C. § 3006A(d)(3). Snyder's application was deficient in that the CJA requires an attorney to attach a mem-

orandum of hours expended and an itemized list of expenses.[1] Snyder did not attach the necessary information to his application. Accordingly, his application was returned to the district court with the request that Attorney Snyder provide the proper attachments. Thereafter, Snyder returned the application to the secretary of the district judge with a monetary, not an hourly, breakdown of his time and again without the requested itemization of expenses.[2] Once again his application was returned by the chief judge with the notation that compliance with the CJA guidelines was still necessary to process the application.

Snyder then sent to the district judge's secretary a letter, dated October 6, "for the purpose of responding to" the chief judge's request. Snyder stated that he was "appalled" at the small amount paid to attorneys for indigent criminal defense work. He indicated his displeasure at the "extreme gymnastics" required to receive "puny amounts." He then stated to the court: "We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it." Snyder concluded his letter by stating that he was "extremely disgusted" by the treatment of him by the Eighth Circuit, that he wished to be taken off the list of attorneys willing to accept appointment in indigent cases, and that he had "simply had it." [3]

Upon receipt of this information, the chief judge requested the district court to confer with Snyder and to determine if Snyder would retract his disrespectful remarks to the court. Snyder refused. On December 22, 1983, this court issued an order to show cause why he should not be suspended from the practice of law in the federal courts for his refusal to offer services under the CJA and to comply with relevant guidelines. Snyder requested a hearing by the full court. *See* Fed.R. App.P. 46(c). The full court voted to refer the matter to a panel.

At oral argument, Attorney Snyder was requested once again to purge himself, as an officer of the court, by agreeing to accept appointment under the Act and by otherwise complying with the Act's guidelines. The panel also requested him to demonstrate in writing that he would be respectful in his relations with the federal courts and to offer a retraction and sincere apology for his disrespectful remarks rendered in his letter of October 6. Snyder conditionally offered his continued services under the CJA, but contumaciously refused to retract his previous remarks or apologize to the court.

*Attorney Snyder's Remarks to the Court*

■ We first turn to Snyder's refusal to comply with the guidelines under the CJA for documentation of expenses. An integral part of Snyder's refusal to comply with CJA guidelines was his explicit statement of disrespect to the federal court. Snyder's conduct not only constituted disrespect but served as well to impede the orderly processing of attorney fee applications. In this direct sense he has served to impede the administration of justice.

As a member of the North Dakota bar and as a licensed practitioner in both the federal district court and the court of appeals, Attorney Snyder is bound by the ethical canons of the legal profession.[4] The relevant disciplinary rule states: "A lawyer shall not: ... Engage in conduct

---

1. *Guidelines for the Administration of the Criminal Justice Act,* Ch. 2 § 3, Vol. VII, Guide to Judiciary Policies & Procedures.

2. Snyder's note accompanying the returned application stated that "the amounts [on the time sheet] aren't exactly right due to our computer's lack of the right money codes."

3. Based upon his refusal to comply with the CJA guidelines, Snyder was denied excess attorney fees and denied unitemized expenses.

4. The ethical code adopted by each state defines the professional responsibility of every attorney who is a member of that state's bar. However, as a federal court, our authority to discipline Attorney Snyder is defined in Fed.R.App.P. 46(c):

    Disciplinary Power of the Court over Attorneys. A court [of] appeals may, after reasonable notice and an opportunity to show cause to the contrary, and after hearing, if requested, take any appropriate disciplinary action against any attorney who practices before it

that is prejudicial to the administration of justice." The Model Code of Professional Responsibility, DR 1–102(A)(5).[5] Equally important is the recognition that an attorney must maintain the proper respect for the court as an institution. As stated in the Model Code:

> Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and the judges thereof; to observe the Code of Professional Responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with his brother lawyers in supporting the organized bar through the devoting of his time, efforts, and financial support as his professional standing and ability reasonably permit; to conduct himself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of his clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety.

*Id.* at EC 9–6.

As we will discuss, Snyder now conditionally has offered to serve in indigent cases and to comply with the CJA guidelines. However, in a letter to the court he has otherwise refused to retract or apologize for his disrespectful remarks to the court. He asserts that, although his remarks were "harsh," as a "matter of principle" no further statement is due the court. Letter from Robert J. Snyder to Chief Judge Lay (February 27, 1984).

We find Snyder's present statement that he will conditionally comply with the guidelines not enough. His refusal to show continuing respect for the court and his refusal to demonstrate a sincere retraction of his admittedly "harsh" statements are sufficient to demonstrate to this court that he is not presently fit to practice law in the federal courts. All courts depend upon the highest level of integrity and respect not only from the judiciary but from the lawyers who serve in the court as well. Without public display of respect for the judicial branch of government as an institution by lawyers, the law cannot survive.[6] This is not to say that courts cannot and should not be subject to proper criticism and comment; however, when an attorney becomes disrespectful in response to a court's request that counsel comply with a congressional mandate, then we deal with a different matter. Without hesitation we find Snyder's disrespectful statements as to this court's administration of CJA contumacious conduct. We deem this unfortunate.

We find that Robert Snyder shall be suspended from the practice of law in the federal courts of the Eighth Circuit for a period of six months; thereafter Snyder should make application to both this court and the federal district court of North Dakota to be readmitted.

*Implementation of the CJA in North Dakota*

■ In further response to the show cause order Attorney Snyder alleges that

---

for conduct unbecoming a member of the bar or for failure to comply with these rules or any rule of the court.

**5.** Although the American Bar Association has recently adopted new Model Rules of Professional Conduct, the older Model Code of Professional Responsibility is still in effect in North Dakota (the state in which Attorney Snyder practices).

**6.** It is not respect for the judge personally that is required of attorneys; it is respect for the legal institution that the judge represents. As the Supreme Court of Pennsylvania recently stated:

> The "law" is given corporeal existence in the form of the judge. When carrying out the

judicial function, the judge becomes a personification of justice itself. When presiding over any aspect of the judicial process, the judge is not merely another person in the courtroom, subject to affront and insult by lawyers. "The obligation of the lawyer to maintain a respectful attitude toward the court is 'not for the sake of the temporary incumbent of the judicial office,' but to give due recognition to the position held by the judge in the administration of the law." ABA Standards, The Defense Function, § 7.1, Commentary at 259. The judge *is* the court, and a display of insolence and disrespect to him is an insult to the majesty of the law itself. *Commonwealth of Pennsylvania v. Rubright,* 489 Pa. 356, 414 A.2d 106, 110 (1980).

the implementation of the CJA in North Dakota relies exclusively on an attorney list of those "willing" to serve. He therefore asserts that his refusal to accept any future CJA cases was in compliance with the plan and that he should not be censured for his lack of willingness to serve any more than the vast number of lawyers within the district who were not on the list by reason of their unwillingness to serve. Second, Snyder asserts that, because he lives in a rural area with a smaller population and his firm is willing to try criminal cases, whereas the vast number of lawyers in the district are not so willing, his firm receives a disproportionate number of appointments under the CJA. He also protests that the statutory fee under the CJA is inadequate to compensate him even for his overhead. Third, Snyder complains that the North Dakota list of attorneys willing to serve is not a current list; it does not include lawyers newly admitted to the bar and includes a number of lawyers who are deceased or inactive. He asserts, however, that he is now willing to continue to serve on the CJA panel provided that other qualified attorneys are placed on the list for appointment. We find merit in Snyder's conditional offer of service.

This court has consistently recognized the duty of an attorney practicing in the federal courts, as an implied obligation, to serve willingly as an officer of the court in a capacity *pro bono publico* (for the public good). *See, e.g., Peterson v. Nadler,* 452 F.2d 754, 758 (8th Cir.1971). In the case of *Tyler v. Lark* we noted:

> "An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a 'taking of his services.'"

*Tyler v. Lark,* 472 F.2d 1077, 1079 (8th Cir.1973) (quoting *United States v. Dillon,* 346 F.2d 633, 635 (9th Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966)), *cert. denied,* 414 U.S. 864, 94 S.Ct. 114, 38 L.Ed.2d 84 (1973).

Many state courts have similarly observed that counsel must assist the court by carrying on *pro bono* representation in criminal cases. *See, e.g., Ex parte Dibble,* 310 S.E.2d 440, 441 (S.C.Ct.App.1983) ("It has been traditionally held that a lawyer, by accepting a license to practice law, becomes an officer of the court and assumes the obligation of representing, without pay, indigent defendants in criminal cases."); *Yarbrough v. Superior Court of Napa County,* 150 Cal.App.3d 388, 395, 197 Cal. Rptr. 737, 741 (Ct.App.1983) ("An attorney is an officer of the court before which he or she was admitted to practice and is expected to discharge his or her professional responsibilities [to represent indigents] at all times, particularly when expressly called upon by the courts to do so."). Recently, the Supreme Court of Missouri held that attorneys licensed to practice in the state could be appointed to serve in criminal cases with no compensation:

> "The term 'profession,' it should be borne in mind, as a rule is applied to a group of people pursuing a learned art as a common calling in the spirit of public service where economic rewards are definitely an incidental, though under the existing economic conditions undoubtedly a necessary by-product. In this a profession differs radically from any trade or business which looks upon money-making and personal gain as its primary purpose. The lawyer cannot possibly get away from the fact that his is a public task...."

*State ex rel. Wolff v. Ruddy,* 617 S.W.2d 64, 65–66 (Mo.1981) (quoting Anton-Hermann Chroust, 1 *The Rise of the Legal Profession in America* x–xi (1965)), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

The profession of law rests upon its commitment to public service and has long been recognized as a profession that re-

quires its membership to engage in *pro bono* activities. Acceptance of appointment under the CJA, a service that lawyers do not perform totally without compensation, is consistent with this obligation of the members of the bar.[7] Before the CJA provided for compensation, many lawyers willingly accepted the defense of indigents in federal criminal cases without expectation of any compensation. The CJA was a recognition by Congress that indigent criminal defendants should have an opportunity to receive the services of competent counsel. Although the compensation allowed by the Act was never intended to fully recompense the lawyer for the time spent on a case, Congress intended that the amount allowed would at least approach the cost of a lawyer's overhead. It is true that the allowances awarded are much lower than the fees charged by many lawyers in non-indigent cases. However, the Act is intended to contain elements of *pro bono* work and not to be merely a government-subsidized, employment service.[8]

The North Dakota plan which contemplates that only lawyers who willingly volunteer for appointments will be assigned to indigent cases appears to rest on the Model Plan approved by the Criminal Justice Committee of the Judicial Conference.[9] Nonetheless, we find that Snyder's objections raise considerable concern as to the efficacy of any plan which depends totally upon voluntary participation.[10]

We find merit in the reasoning that there is an implied obligation to perform *pro bono* trial services on every licensed attorney who is engaged in litigation, not just those who are willing to come forward. The plan as now constituted penalizes those who specialize in criminal law because more than their share of the district's *pro bono* work falls on their shoulders; under a voluntary plan, particularly in rural areas, only a few attorneys come forward and this unduly results in a disproportion of assignments to a minority of the lawyers practicing in the district. Also, appointing only those who feel they have competence in criminal cases in no way assures competency; it is common knowledge that many counsel appointed by district courts under the CJA are young lawyers just out of law school trying to gain early experience in the trial of cases.

Because Snyder is participating under a plan which is purely voluntary, his refusal to serve is in technical compliance with the plan. However, his conditional agreement to serve in the future, if other attorneys who are competent to try cases are included on the panel, also has considerable merit. Under the Criminal Justice Act each district is required to submit for approval its plan for implementation of the CJA to the Judicial Council of the Circuit. 18 U.S.C. § 3006A(a). We therefore refer the study as to alleged insufficiency of partici-

---

7. Although some compensation is afforded an attorney under the CJA, the Act does not attempt to fully compensate an attorney for the work performed. Thus, the Act has a *pro bono* factor built into its compensation scheme. *See infra* note 8 and accompanying text.

8. The legislative history of the CJA states:

    As reported by the subcommittee, H.R. 4816 provided for compensation to court-appointed attorneys at a rate not to exceed $15 per hour for time reasonably spent, and carefully accounted for, on behalf of an impoverished defendant. This amount was conceded by virtually every witness at the hearings to be below normal levels of compensation in legal practice. It was nevertheless widely supported as a reasonable basis upon which lawyers could carry out their profession's responsibility to except [sic] court appointments,

without either personal profiteering or undue financial sacrifice....

H.R.Rep. No. 864, 88th Cong., 2nd Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 2990, 2997–98. Since the enactment of the CJA, the hourly rate of compensation for attorneys has increased to $20 for preparation time and $30 for trial time.

9. "Model Plan for the Composition, Administration and Management of the Panel of Private Attorneys under the Criminal Justice Act," *Guidelines for the Administration of the Criminal Justice Act,* Vol. VII, App. G, Guide to Judiciary Policies and Procedures.

10. We note that, in districts where a federal public defender program assumes a substantial representation of indigents in criminal cases, the plan adopted may be more flexible in accepting volunteers.

pation of the bar in the panels of the CJA to the district courts and the Judicial Council.

We recognize that any requirement that all active, licensed trial practitioners be eligible for appointment under the CJA raises the immediate question of competency and the continuing concern of the courts and the bar over the increasing number of suits relating to the charge of ineffective assistance of counsel in criminal cases. But in our judgment the fear of incompetent counsel being appointed is, for the most part, exaggerated.

The most common successful complaint relating to ineffective assistance of counsel is the failure of the lawyer to adequately investigate the case and to call defense witnesses. *See, e.g., United States v. Baynes,* 687 F.2d 659 (3rd Cir.1982); *Eldridge v. Atkins,* 665 F.2d 228 (8th Cir. 1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982); *Rummel v. Estelle,* 590 F.2d 103 (5th Cir.1979). Competent lawyers who specialize in civil trials know that the success or failure of a trial depends on the thoroughness of the investigation of facts and of the trial preparation. This basic rule of trial preparation is true for civil as well as criminal cases; the attorney who is competent to practice in civil matters is competent to appear in criminal cases. Lawyers who specialize in civil cases must necessarily engage in a diversity of study in all spheres of our social, political, and economic systems. The step across to the criminal law, by the experienced civil trial attorney, is really no step at all.

We also recognize that many civil trial lawyers are not currently conversant with the Rules of Criminal Procedure and the various rules governing the practice of criminal law.[11] Nonetheless we would deem it incumbent on the civil trial bar to become familiar with these rules, as they would any other procedural or substantive rule of law not previously encountered. Most civil lawyers are generalists; when confronted with a specialized area of litigation, they quickly master the law and the facts. Few lawyers process their first appeal to this court or to the Supreme Court of the United States without doing special study to master the new procedure at hand. We suggest that it is no more difficult to conduct a criminal trial than it is to conduct an intricate 10b–5 securities case or a complicated products-liability case.

Much of the criticism that has been leveled at the trial bar as to the lack of effective representation has focused on lawyers representing indigents in criminal cases.[12] While ineffective assistance of

---

11. The Model Plan provides:

> Attorneys who serve on the CJA Panel must be members in good standing of the federal bar of this district, and have demonstrated experience in, and knowledge of, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.

We note, generally, that knowledge of the Federal Rules of Criminal Procedure and Federal Rules of Evidence is necessary to pass most state bars. It is reasonable to assume that a lawyer may be called upon some day to use the skills which he or she was required to demonstrate to enter the legal profession.

12. For example, Chief Justice Burger has expressed concern that indigents suffer most from "incompetent trial advocates." Burger, *Some Further Reflections on the Problem of Adequacy of Trial Counsel,* 49 Fordham L.Rev. 1, 8 (1980). Judge Bazelon, a distinguished jurist of the D.C. Circuit, has been critical of the competency of the criminal defense bar for years. *See, e.g.,*

Bazelon, *The Defective Assistance of Counsel,* 42 U.Cin.L.Rev. 1 (1973). Our opinion disagrees with Judge Bazelon's views that civil trial lawyers are not competent to try criminal cases. Judge Bazelon states that the time and money spent by a civil lawyer in learning how to try a criminal case "would be immense" and that too many of these lawyers would have to "rediscover the wheel." He also adds that the "uptown lawyer" often has a serious communication problem with the indigent client and that they are "not prepared for the cultural shock of learning that their client is neither middle class nor cast in their image of the 'deserving poor.'"

We must respectfully disagree. There is no empirical data to support Judge Bazelon's theory. The fact is, the present system of allowing only volunteers to come forward for appointment under the CJA brings forth many inexperienced, young lawyers looking for their first case to try. Appointing only those who specialize in criminal cases conveniently shields a vast number of experienced lawyers who seek an exclu-

counsel certainly can occur in appointed-counsel cases, charges of incompetency of the criminal trial bar are distorted by the placing of the burden of indigent representation totally on a small segment of the bar. Skilled and experienced civil trial attorneys, some of the best advocates in the profession, are excused from service under the CJA by the Model Plan and district plans adopted in conformity therewith. It is immaterial whether their absence is related to the lack of economic incentive to serve under the CJA or to their alleged lack of experience in the criminal field. Clearly, when such a large number of competent trial attorneys are categorically removed from participation, services rendered to indigents will not consistently meet the highest standards of criminal representation. We do not believe that Congress, in passing the CJA, intended *pro bono* representations to fall upon the few; in this sense we think careful study by the district courts and the Judicial Council should be given to the idea that all active trial lawyers in the federal courts be obligated to provide *pro bono* services to the indigent either in the civil law or in the criminal defense field. *Cf. Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 (8th Cir.1984).

## ORDER DENYING PETITION FOR REHEARING EN BANC

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges.

HEANEY, Circuit Judge.

This matter comes before the Court on a petition for rehearing en banc. Attorney Snyder, now represented by counsel, raises several points in his petition: (1) that Chief Judge Lay should recuse himself under 28 U.S.C. § 455(b)(1) because of his personal knowledge of facts gained under the Criminal Justice Act (CJA); (2) that Snyder was not given proper notice that his allegedly disrespectful letter could be a basis for discipline; (3) that Snyder's letter of complaint was an exercise of free speech protected by the First Amendment; (4) that his letter was not disrespectful; and (5) that the district court and the court secretary encouraged Mr. Snyder in directing that the letter of complaint be sent.

Before dealing with these arguments, we think it wise to state the facts more precisely. Robert Snyder was appointed by the United States District Court for the District of North Dakota to represent 12 defendants in a period from January 1, 1979 to early 1984. It appears from the record that eight of these cases were disposed of without trial and four involved at least some court appearances. According to the records that have been furnished to this Court, Mr. Snyder devoted approximately 270 hours to these cases over a four and one-half year period.

On August 9, 1983, Mr. Snyder completed work on a case in which he had been appointed to represent an indigent, and submitted a voucher in the sum of $1,898.55 to the district court for payment. Judge Bruce Van Sickle reduced the claim by $102.50 and forwarded this voucher to this Court on August 17. On September 6, this Court returned the voucher to Mr. Snyder requesting him to submit a detailed memorandum pursuant to 22.2 B of the guidelines, and to support his claim for long distance calls by attaching an itemized statement. The voucher was returned to us on September 26, but because he did not have both the number of hours expended as well as the dollar amounts, requested by the guidelines, it was returned by this Court to Mr. Snyder on the same date. On October 20, the completed voucher was returned to this Court. Included in the return was Mr. Snyder's letter of October 6; this letter is attached hereto as Addendum No. 1. The letter stated in part:

---

sive, civil practice because of the higher monetary rewards involved. The CJA is not designed to compensate any lawyer for his or her self-education. Nonetheless, we are confident that skilled civil trial lawyers could adjust to crimi-

nal practice, first, out of the professional obligation to provide effective counsel for the defendant; and second, out of concern for the quality of representation to be found generally in our courts and our profession.

We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it.

Further, I am extremely disgusted by the treatment of us by the Eighth Circuit in this case, and you are instructed to remove my name from the list of attorneys who will accept criminal indigent defense work. I have simply had it.

On November 3, 1983, Chief Judge Lay wrote to Judge Van Sickle the letter which is attached hereto as Addendum No. 2. A copy of this letter was sent to Mr. Snyder. In that letter Chief Judge Lay stated in part:

I consider Mr. Snyder's letter to your secretary as being totally disrespectful to the federal courts and to the judicial system. It demonstrates a total lack of respect for the legal process and the courts.

*   *   *   *   *   *

Mr. Snyder indicates that he would like to have his name removed from the list of attorneys who will be appointed to represent indigent criminal defendants. As far as the court is concerned, I will honor that request and I instruct you to remove his name from the list of attorneys who will be appointed in criminal cases. However, in view of the letter that Mr. Snyder forwarded, I question whether he is worthy of practicing law in the federal courts on any matter. It is my intention to issue an order to show cause as to why he should not be suspended from practicing in any federal court in this circuit for a period of one year. This suspension, of course, will apply to his appearance in federal court in North Dakota. We will, of course, give Mr. Snyder an opportunity to respond before any final determination is made.

On December 20, 1983, Chief Judge Lay caused to be issued the order to show cause which forms the basis of the present proceedings. A hearing on the order to show cause was held on February 15, 1983. At the hearing to show cause, Judge Richard Arnold read excerpts of Snyder's letter of October 6 to Mr. Snyder and asked Mr. Snyder the following question: "I am asking you sir if you are prepared to apologize to the Court for the tone of your letter." Mr. Snyder responded as follows: "That is not the basis that I am being brought forth before the Court today. It is not an apology and I could have apologized when an apology was demanded from Judge Lay and I declined * * * but I did not apologize then and I am not apologizing now." Judge Arnold stated to Mr. Snyder: "I just want to get this clear that you are declining to aplogize for the letter of October 6." Snyder said: "I am." At the close of the hearing the Court gave Mr. Snyder an additional ten days in which to state that he was willing and ready to represent indigent defendants, that he would comply with the guidelines, and that he would apologize to the Court for his letter of October 6.

On February 22, Snyder wrote to this Court stating:

If and when a new Plan for the implementation of the Criminal Justice Act in the State of North Dakota is enacted, the undersigned will enthusiastically obey its mandates, just as he has obeyed the mandates, or lack thereof, in the existing Plan.

Further, the undersigned states that he will make every good faith effort possible to comply with the Court's guidelines regarding the payment of attorney's fees and expenses. [*See* Addendum No. 3.]

No apology for the October 6 letter was made. Thereafter, on February 24, 1984, Chief Judge Lay wrote to Mr. Snyder giving him another opportunity to apologize. He stated: "I am confident that if such a letter is forthcoming that the Court will dissolve the order." *See* Addendum No. 4.

Mr. Snyder responded as follows:

I am in receipt of your letter dated February 24, 1984. Please be advised that my letter of February 22, 1984 entirely states my position concerning this matter.

I cannot, and will never, in justice to my conscience, apologize for what I con-

sider to be telling the truth, albeit in harsh terms. You must therefore search your conscience and determine what course of action will best serve the interest of justice and the administration of the Eighth Circuit.

It is unfortunate that the respective positions in the proceeding have so hardened. However, I consider this to be a matter of principle, and if one stands on principle, one must be willing to accept the consequences.

Thank you for your time and attention.

We turn now to the arguments raised by Snyder on his petition for rehearing en banc. We deal with them seriatim.

■ First, it is clear that a judicial officer is not disqualified under 28 U.S.C. § 455 because of personal knowledge of facts unless the knowledge arises out of extra-judicial observation or misconduct. *See United States v. Coven,* 662 F.2d 162, 168 (2d Cir.1981), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982). Chief Judge Lay, in processing Snyder's claim and in seeking information to process the claim, was carrying out his judicial responsibilities. Any factual information gained in doing so or any judicial action taken by him as chief judge did not in any way arise in an extra-judicial capacity. Chief Judge Lay possesses no personal bias against Snyder and properly served on the panel to hear Mr. Snyder's response to the Court's show cause order.

Second, it is abundantly clear from the record that Snyder had notice that his disrespectful letter could be a basis for discipline. Snyder was given at least three opportunities to apologize for the letter and declined to do so.

■ Third, Snyder's counsel states that Mr. Snyder's letter was an exercise of free speech. Snyder urges that he should not be disciplined for exercising his First Amendment rights to criticize, and express

frustration toward, the Court. The gravamen of the situation is that Snyder in his letter became harsh and disrespectful to the Court. It is one thing for a lawyer to complain factually to the Court, it is another for counsel to be disrespectful in doing so.

It is well settled that disrespectful remarks by an officer of the court do not fall within the ambit of protected speech. As Justice Stewart stated: "Obedience to official precepts may require abstention from what in other circumstances might be constitutionally protected speech." *In re Sawyer,* 360 U.S. 622, 646–647, 79 S.Ct. 1376, 1388, 3 L.Ed.2d 1473 (1959) (Stewart, J., concurring).[1]

Fourth, Snyder states that his letter is not disrespectful. We disagree. In our view, the letter speaks for itself.

Snyder seeks to mitigate his conduct by stating that the district court and the district court's secretary directed that the letter be sent. It appears from the affidavit of Judge Bruce Van Sickle that he was aware of Mr. Snyder's letter to his secretary and viewed it as that of a frustrated lawyer hoping that his comments with respect to the fee schedule and the paperwork would serve as a basis for some change in the process. There is nothing in the record to indicate that Judge Van Sickle instructed Mr. Snyder to be disrespectful to this Court. Snyder wrote the letter, he is intelligent and capable of independently evaluating the ramifications of his conduct, and he must take responsibility for his own actions.

We have difficulty with the proposition that we should condone, or that anyone should approve, a lawyer's exercise of open disrespect for the court before which the lawyer practices. To repeat what we have earlier observed, "a display of insolence and disrespect to [the Court] is an insult to the majesty of the law itself." *In the*

---

1. *See also State v. Nelson,* 210 Kan. 637, 504 P.2d 211, 214 (1972), which states:

Concerning respondent's argument that DR 1–102(A)(5) creates an impermissible and chilling effect on "First Amendment freedoms," an examination of decisions on the point (12 A.L.R.3d, Anno., p. 1408) reveals the consensus to be that an attorney's right to free speech is tempered by his obligation to both the courts and the bar, an obligation to which ordinary citizens are not held.

*Matter of: Attorney Robert J. Snyder,* 734 F.2d 334, 337 n. 6 (8th Cir. April 13, 1984). However, because of Snyder's past cooperation with the district court in serving on *pro bono* matters, because of his now professed willingness to continue to do so and to comply with the CJA guidelines, and because of the alleged misunderstanding as to the reasons for his suspension—we conditionally vacate the panel's order of suspension and provide an additional 10 days from the date of this order for Attorney Snyder to provide a sincere letter of apology to this Court for the disrespectful comments directed to the Court in his letter of October 6, 1983, sent to Judge Van Sickle's secretary. The clerk is directed that if Snyder fails to comply with this request, our original order of suspension will be reinstated with the six month suspension to run from the date of the original order. The Clerk is further directed to send a copy of this order to each of the lawyers who signed the petition for rehearing en banc and to the president and secretary of the Burleigh County Bar Association.

The petition for rehearing en banc is denied on the ground that the majority of judges in regular active service did not vote to grant the petition as required by Fed.R. App.P. 35.

BRIGHT and McMILLIAN, Circuit Judges, would grant the petition for rehearing en banc.

### ADDENDUM NO. 1

BICKLE, COLES AND SNYDER, CHARTERED

ATTORNEYS AT LAW

219½ EAST BROADWAY

THE LITTLE BUILDING

P.O. BOX 2071

BISMARCK, NORTH DAKOTA 58502–2071

October 6, 1983

Helen Monteith
Federal Building
3rd Street & Rosser Avenue
Bismarck, ND 58501

Re: United States of America vs. Dennis Warren

Dear Helen:

I am in receipt of the letter of September 26, 1983, from the Eighth Circuit Court of Appeals, in which our latest attempt to justify our time and expenses for Dennis Warren has again been set back. This letter is for the purpose of responding to that letter.

In the first place, I am appalled by the amount of money which the federal court pays for indigent criminal defense work. The reason that so few attorneys in Bismarck accept this work is for that exact reason. We have, up to this point, still accepted the indigent appointments, because of a duty to our profession, and the fact that nobody else will do it.

Now, however, not only are we paid an amount of money which does not even cover our overhead, but we have to go through extreme gymnastics even to receive the puny amounts which the federal courts authorize for this work. We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it.

Further, I am extremely disgusted by the treatment of us by the Eighth Circuit in this case, and you are instructed to remove my name from the list of attorneys who will accept criminal indigent defense work. I have simply had it.

Thank you for your time and attention.

Very truly yours,

BICKLE, COLES AND SNYDER, CHARTERED

/s/ Robert J. Snyder
Robert J. Snyder
Attorney at Law

### ADDENDUM NO. 2

UNITED STATES COURT OF APPEALS

EIGHTH CIRCUIT

DONALD P. LAY
    CHIEF JUDGE

November 3, 1983
The Hon. Bruce M. Van Sickle
United States District Judge
P.O. Box 670
Bismarck, North Dakota 58501

Re: Cl–83–4–01. U.S.A. v. Dennis Warren.

Dear Judge Van Sickle:

I am enclosing copies of recent correspondence of attorney Robert J. Snyder to your secretary, Helen Montieth, and from your secretary to my administrative assistant, June Boadwine. It is unfortunate that this matter now requires additional time, but because of the responses made by your secretary and Mr. Snyder, it is necessary for me to intervene.

I consider Mr. Snyder's letter to your secretary as being totally disrespectful to the federal courts and to the judicial system. It demonstrates a total lack of respect for the legal process and the courts.

The Criminal Justice Act was passed as a response to the inadequacy of a prior system which did not award any type of reimbursement of expenses or time spent by a lawyer. I'm confident it was true when you were in practice as it was when I represented indigents that the bar performed without any reimbursement of either expenses or attorneys' fees. This pro bono work was considered to be a part of our professional responsibility. The CJA was never intended to provide a reasonable attorney fee, only to provide funds to cover overhead and expenses.

Regardless of an attorney's view as to whether he feels obligated to provide pro bono work, my concern now is related to the apparent refusal of the attorney involved in this case to comply with the Criminal Justice Act and the guidelines promulgated under it. In the original instance, Mr. Snyder failed to forward any time itemization, contrary to the statutory guidelines, and on that basis and based upon my direction to my administrative assistant, the claim for services was returned to you with the request that compliance be obtained. Mr. Snyder then itemized the amounts in dollars, but failed, as requested by the Administrative Office, to set forth the number of hours or portions of hours in each instance on his itemized schedule. We are unable to ascertain whether he was charging time under his own fee schedule or that of the statute. In addition, he failed to itemize his out-of-pocket expenses on a separate sheet. Although these requirements may seem technical, under the Criminal Justice Act the federal government is dealing in millions of dollars and Congress requires proper itemization so that budgetary limitations may be accounted for in a proper manner.

As you know, processing these vouchers takes a good deal of time on my part, as well as on the part of every district judge who must approve them. If a district judge's staff is to assist, it is essential they understand the guidelines and require attorneys to comply with them. If a voucher is not properly submitted and checked by the district court, it requires a great deal of time on my part in getting ultimate approval of it by the Administrative Office. Volume VII of the Guide to Judiciary Policies and Procedures contains the guidelines. However, when a lawyer becomes disrespectful and refuses to follow the guidelines and refuses to cooperate with the court, then it is a more significant problem.

Mr. Snyder indicates that he would like to have his name removed from the list of attorneys who will be appointed to represent indigent criminal defendants. As far as the court is concerned, I will honor that request and I instruct you to remove his name from the list of attorneys who will be appointed in criminal cases. However, in view of the letter that Mr. Snyder forwarded, I question whether he is worthy of practicing law in the federal courts on any matter. It is my intention to issue an order to show cause as to why he should not be suspended from practicing in any federal court in this circuit for a period of one year. This suspension, of course, will apply to his appearance in federal court in North Dakota. We will, of course, give Mr. Snyder an opportunity to respond before any final determination is made.

In view of Mr. Snyder's attitude and refusal to assist the court in processing this voucher under the guidelines, I am approving a fee for him only to the statutory limit and properly itemized expenses.

Before taking the steps noted above, I would appreciate your views on the matter.

Sincerely,

/s/ Donald P. Lay

Donald P. Lay

/j

Encls.

cc: Mr. Robert Snyder

Encls.

## ADDENDUM NO. 3

BICKLE, COLES AND SNYDER, CHARTERED

ATTORNEYS AT LAW

219½ EAST BROADWAY

THE LITTLE BUILDING

P.O. BOX 2071

BISMARCK, NORTH DAKOTA 58502–2071

February 22, 1984

Clerk
United States Court of Appeals
For the Eighth Circuit
525 Federal Courts Building
316 North Robert Street
St. Paul, MN 55101

Re: Robert J. Snyder—Misc. 84–8017

Dear Sir:

In response to the oral demands made by the Court to the undersigned at the hearing on the Order to Show Cause, held in St. Paul on February 16, 1984, the undersigned responds as follows:

If and when a new Plan for the implementation of the Criminal Justice Act in the State of North Dakota is enacted, the undersigned will enthusiastically obey its mandates, just as he has obeyed the mandates, or lack thereof, in the existing Plan.

Further, the undersigned states that he will make every good faith effort possible to comply with the Court's guidelines regarding the payment of attorney's fees and expenses.

Thank you for your time and attention.

Very truly yours,

BICKLE, COLES AND SNYDER, CHARTERED

/s/ Robert J. Snyder

Robert J. Snyder

Attorney at Law

RJS/cjm

cc: Judge Van Sickle
    Judge Benson
    Dewey Kautzmann

## ADDENDUM NO. 4

UNITED STATES COURT OF APPEALS

EIGHTH CIRCUIT

DONALD P. LAY

CHIEF JUDGE

February 24, 1984

Mr. Robert J. Snyder
Bickle, Coles and Snyder
Attorneys at Law
P.O. Box 2071
Bismarck, North Dakota 58502–2071

Re: Order to Show Cause. Misc. No. 84–8017.

Dear Mr. Snyder:

The clerk has forwarded to me a copy of your letter you have written to the court indicating that you will continue to offer your services for pro bono representation under the Criminal Justice Plan.

The court expressed its opinion at the time of the oral hearing that interrelated with our concern and the issuance of the order to show cause was the disrespect that you displayed to the court by way of your letter addressed to Helen Montieth, Judge Van Sickle's secretary, of October 6, 1983. The court expressly asked if you would be willing to apologize for the tone of the letter and the disrespect displayed. You serve as an officer of the court and, as such, the Canons of Ethics require every lawyer to maintain a respect for the court as an institution.

Before circulating your letter of February 23, I would appreciate your response to Judge Arnold's specific request, and the court's request, for you to apologize for the letter that you wrote.

Please let me hear from you by return mail. I am confident that if such a letter is forthcoming that the court will dissolve the order.

Sincerely,

/s/ Donald P. Lay

Donald P. Lay

cc: Chief Judge Benson
    Judge Van Sickle
    Mr. Maland, Clerk's Office