# IN RE SNYDER

No. 84–310.   Argued April 16, 1985—Decided June 24, 1985

Burger, C. J., delivered the opinion of the Court, in which all other Members joined except Blackmun, J., who took no part in the decision of the case.

*David L. Peterson* argued the cause for petitioner. With him on the briefs were *Robert P. Bennett, John C. Kapsner, Charles L. Chapman,* and *Irvin B. Nodland.*

*John J. Greer* argued the cause for respondent United States Court of Appeals for the Eighth Circuit. With him on the brief was *Ross H. Sidney.*[*]

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to review the judgment of the Court of Appeals suspending petitioner from practice in all courts of the Eighth Circuit for six months.

## I

In March 1983, petitioner Robert Snyder was appointed by the Federal District Court for the District of North Dakota to represent a defendant under the Criminal Justice Act. After petitioner completed the assignment, he submitted a claim for $1,898.55 for services and expenses. The claim was reduced by the District Court to $1,796.05.

Under the Criminal Justice Act, the Chief Judge of the Court of Appeals was required to review and approve expenditures for compensation in excess of $1,000.[1] 18 U. S. C. § 3006A(d)(3). Chief Judge Lay found the claim insufficiently documented, and he returned it with a request for additional information. Because of technical problems with his computer software, petitioner could not readily provide the information in the form requested by the Chief Judge. He did, however, file a supplemental application.

The secretary of the Chief Judge of the Circuit again returned the application, stating that the proffered documentation was unacceptable. Petitioner then discussed the matter with Helen Monteith, the District Court Judge's secretary, who suggested he write a letter expressing his view. Peti-

---

[*]*Charles S. Sims* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

*Frank E. Bazler* and *Albert L. Bell* filed a brief for the Ohio State Bar Association as *amicus curiae.*

[1]The statutory limit has since been raised to $2,000. 18 U. S. C. § 3006A(d)(2) (1982 ed., Supp. III).

tioner then wrote the letter that led to this case. The letter, addressed to Ms. Monteith, read in part:

> "In the first place, I am appalled by the amount of money which the federal court pays for indigent criminal defense work. The reason that so few attorneys in Bismarck accept this work is for that exact reason. We have, up to this point, still accepted the indigent appointments, because of a duty to our profession, and the fact that nobody else will do it.
>
> "Now, however, not only are we paid an amount of money which does not even cover our overhead, but we have to go through extreme gymnastics even to receive the puny amounts which the federal courts authorize for this work. We have sent you everything we have concerning our representation, and I am not sending you anything else. You can take it or leave it.
>
> "Further, I am extremely disgusted by the treatment of us by the Eighth Circuit in this case, and you are instructed to remove my name from the list of attorneys who will accept criminal indigent defense work. I have simply had it.
>
> "Thank you for your time and attention." App. 14–15.

The District Court Judge viewed this letter as one seeking changes in the process for providing fees, and discussed these concerns with petitioner. The District Court Judge then forwarded the letter to the Chief Judge of the Circuit. The Chief Judge in turn wrote to the District Judge, stating that he considered petitioner's letter

> "totally disrespectful to the federal courts and to the judicial system. It demonstrates a total lack of respect for the legal process and the courts." *Id.*, at 16.

The Chief Judge expressed concern both about petitioner's failure to "follow the guidelines and [refusal] to cooperate with the court," and questioned whether, "in view of the let-

ter" petitioner was "worthy of practicing law in the federal courts on any matter." He stated his intention to issue an order to show cause why petitioner should not be suspended from practicing in any federal court in the Circuit for a period of one year. *Id.*, at 17–18. Subsequently, the Chief Judge wrote to the District Court again, stating that if petitioner apologized the matter would be dropped. At this time, the Chief Judge approved a reduced fee for petitioner's work of $1,000 plus expenses of $23.25.

After talking with petitioner, the District Court Judge responded to the Chief Judge as follows:

> "He [petitioner] sees his letter as an expression of an honest opinion, and an exercise of his right of freedom of speech. I, of course, see it as a youthful and exuberant expression of annoyance which has now risen to the level of a cause. . . .
>
> "He has decided not to apologize, although he assured me he did not intend the letter as you interpreted it."
> *Id.*, at 20.

The Chief Judge then issued an order for petitioner to show cause why he should not be suspended for his "refusal to carry out his obligations as a practicing lawyer and officer of [the] court" because of his refusal to accept assignments under the Criminal Justice Act. *Id.*, at 22. Nowhere in the order was there any reference to any disrespect in petitioner's letter of October 6, 1983.

Petitioner requested a hearing on the show cause order. In his response to the order, petitioner focused exclusively on whether he was required to represent indigents under the Criminal Justice Act. He contended that the Act did not compel lawyers to represent indigents, and he noted that many of the lawyers in his District had declined to serve.[2]

---

[2] A resolution presented by the Burleigh County Bar Association to the Court of Appeals on petitioner's behalf stated that of the 276 practitioners eligible to serve on the Criminal Justice Act panel in the Southwestern

He also informed the court that prior to his withdrawal from the Criminal Justice Act panel, he and his two partners had taken 15 percent of all the Criminal Justice Act cases in their district.

At the hearing, the Court of Appeals focused on whether petitioner's letter of October 6, 1983, was disrespectful, an issue not mentioned in the show cause order. At one point, Judge Arnold asked: "I am asking you, sir, if you are prepared to apologize to the court for the tone of your letter?" *Id.*, at 40. Petitioner answered: "That is not the basis that I am being brought forth before the court today." *Ibid.* When the issue again arose, petitioner protested: "But, it seems to me we're getting far afield here. The question is, can I be suspended from this court for my request to be removed from the panel of attorneys." *Id.*, at 42.

Petitioner was again offered an opportunity to apologize for his letter, but he declined. At the conclusion of the hearing, the Chief Judge stated:

> "I want to make it clear to Mr. Snyder what it is the court is allowing you ten days lapse here, a period for you to consider. One is, that, assuming there is a general requirement for all competent lawyers to do pro bono work that you stand willing and ready to perform such work and will comply with the guidelines of the statute. And secondly, to reconsider your position as Judge Arnold has requested, concerning the tone of your letter of October 6." *Id.*, at 50.

Following the hearing, petitioner wrote a letter to the court, agreeing to "enthusiastically obey [the] mandates" of any new plan for the implementation of the Criminal Justice Act in North Dakota, and to "make every good faith effort possible" to comply with the court's guidelines regarding com-

---

Division of the District of North Dakota, only 87 were on the panel. App. 85.

pensation under the Act. Petitioner's letter, however, made no mention of the October 6, 1983, letter. *Id.*, at 51–52.

The Chief Judge then wrote to Snyder, stating among other things:

> "The court expressed its opinion at the time of the oral hearing *that interrelated with our concern* and the issuance of the order to show cause *was the disrespect that you displayed* to the court by way of your letter addressed to Helen Montieth *[sic]*, Judge Van Sickle's secretary, of October 6, 1983. The court expressly asked if you would be willing to apologize for the tone of the letter and the disrespect displayed. You serve as an officer of the court and, as such, the Canons of Ethics require every lawyer to maintain a respect for the court as an institution.
>
> "Before circulating your letter of February 23, I would appreciate your response to Judge Arnold's specific request, and the court's request, for you to apologize for the letter that you wrote.
>
> "Please let me hear from you by return mail. I am confident that if such a letter is forthcoming that the court will dissolve the order." *Id.*, at 52–53. (Emphasis added.)

Petitioner responded to the Chief Judge:

> "I cannot, and will never, in justice to my conscience, apologize for what I consider to be telling the truth, albeit in harsh terms. . . .
>
> "It is unfortunate that the respective positions in the proceeding have so hardened. However, I consider this to be a matter of principle, and if one stands on a principle, one must be willing to accept the consequences." *Id.*, at 54.

After receipt of this letter, petitioner was suspended from the practice of law in the federal courts in the Eighth Circuit for six months. 734 F. 2d 334 (1984). The opinion stated

that petitioner "contumaciously refused to retract his previous remarks or apologize to the court." *Id.*, at 336. It continued:

> "[Petitioner's] refusal to show continuing respect for the court *and his refusal to demonstrate a sincere retraction of his admittedly 'harsh' statements* are sufficient to demonstrate to this court *that he is not presently fit to practice law in the federal courts.* All courts depend on the highest level of integrity and respect not only from the judiciary but from the lawyers who serve in the court as well. Without public display of respect for the judicial branch of government as an institution by lawyers, the law cannot survive. . . . Without hesitation *we find Snyder's disrespectful statements* as to this court's administration of CJA *contumacious conduct.* We deem this unfortunate.
>
> "We find that Robert Snyder shall be suspended from the practice of law in the federal courts of the Eighth Circuit for a period of six months; thereafter, Snyder should make application to both this court and the federal district court of North Dakota to be readmitted." *Id.*, at 337. (Emphasis added.)

The opinion specifically stated that petitioner's offer to serve in Criminal Justice Act cases in the future if the panel was equitably structured had "considerable merit." *Id.*, at 339.

Petitioner moved for rehearing en banc. In support of his motion, he presented an affidavit from the District Judge's secretary—the addressee of the October 6 letter—stating that she had encouraged him to send the letter. He also submitted an affidavit from the District Judge, which read in part:

> "*I did not view the letter as one of disrespect for the Court,* but rather one of a somewhat frustrated lawyer hoping that his comments might be viewed as a basis for some changes in the process.

". . . Mr. Snyder has appeared before me on a number of occasions and has always competently represented his client, and has shown the highest respect to the court system and to me." App. 83–84. (Emphasis added.)

The petition for rehearing en banc was denied.[3] An opinion for the en banc court stated:

> "*The gravamen of the situation is that Snyder in his letter [of October 6, 1983] became harsh and disrespectful to the Court.* It is one thing for a lawyer to complain factually to the Court, it is another for counsel to be disrespectful in doing so.
>
> .     .     .     .     .
>
> ". . . Snyder states that his letter is not disrespectful. We disagree. In our view, the letter speaks for itself." 734 F. 2d, at 343. (Emphasis added.)

The en banc court opinion stayed the order of suspension for 10 days, but provided that the stay would be lifted if petitioner failed to apologize. He did not apologize, and the order of suspension took effect.

We granted certiorari, 469 U. S. 1156 (1985). We reverse.

## II

### A

Petitioner challenges his suspension from practice on the grounds (a) that his October 6, 1983, letter to the District Judge's secretary was protected by the First Amendment, (b) that he was denied due process with respect to the notice of the charge on which he was suspended, and (c) that his challenged letter was not disrespectful or contemptuous. We avoid constitutional issues when resolution of such issues is not necessary for disposition of a case. Accordingly, we consider first whether petitioner's conduct and expressions

---

[3] 734 F. 2d, at 341. Circuit Judges Bright and McMillian voted to grant the petition for rehearing en banc.

warranted his suspension from practice; if they did not, there is no occasion to reach petitioner's constitutional claims.

Courts have long recognized an inherent authority to suspend or disbar lawyers. *Ex parte Garland,* 4 Wall. 333, 378–379 (1867); *Ex parte Burr,* 9 Wheat. 529, 531 (1824). This inherent power derives from the lawyer's role as an officer of the court which granted admission. *Theard* v. *United States,* 354 U. S. 278, 281 (1957). The standard for disciplining attorneys practicing before the courts of appeals[4] is set forth in Federal Rule of Appellate Procedure 46:[5]

> *"(b) Suspension or Disbarment. When it is shown to the court that any member of its bar has been suspended or disbarred from practice in any other court of record, or has been guilty of conduct unbecoming a member of*

---

[4] The panel opinion made explicit that Snyder was suspended from the District Court as well as the Court of Appeals by stating: "[T]hereafter Snyder should make application to both this court and the federal district court of North Dakota to be readmitted." 734 F. 2d, at 337.

Federal Rule of Appellate Procedure 46 does not appear to give authority to the Court of Appeals to suspend attorneys from practicing in the District Court. As the panel opinion itself indicates, the admission of attorneys to practice before the District Court is placed, as an initial matter, before the District Court itself. The applicable Rule of the District Court indicates that a suspension from practice before the Court of Appeals creates only a rebuttable presumption that suspension from the District Court is in order. The Rule appears to entitle the attorney to a show cause hearing before the District Court. Rule 2(e)(2), United States District Court for the District of North Dakota, reprinted in Federal Local Rules for Civil and Admiralty Proceedings (1984). A District Court decision would be subject to review by the Court of Appeals.

[5] The Court of Appeals relied on Federal Rule of Appellate Procedure 46(c) for its action. While the language of Rule 46(c) is not without some ambiguity, the accompanying note of the Advisory Committee on Appellate Rules, 28 U. S. C. App., p. 496, states that this provision "is to make explicit the power of a court of appeals to impose sanctions less serious than suspension or disbarment for the breach of rules." The appropriate provision under which to consider the sanction of suspension would have been Federal Rule of Appellate Procedure 46(b), which by its terms deals with "suspension or disbarment."

644

*the bar of the court, he will be subject to suspension or disbarment by the court.* The member shall be afforded an opportunity to show good cause, within such time as the court shall prescribe, why he should not be suspended or disbarred. Upon his response to the rule to show cause, and after hearing, if requested, or upon expiration of the time prescribed for a response if no response is made, the court shall enter an appropriate order." (Emphasis added.)

The phrase "conduct unbecoming a member of the bar" must be read in light of the "complex code of behavior" to which attorneys are subject. *In re Bithoney,* 486 F. 2d 319, 324 (CA1 1973). Essentially, this reflects the burdens inherent in the attorney's dual obligations to clients and to the system of justice. Justice Cardozo once observed:

"'Membership in the bar is a privilege burdened with conditions.' [An attorney is] received into that ancient fellowship for something more than private gain. He [becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice." *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, 470–471, 162 N. E. 487, 489 (1928) (citation omitted).

As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner

compatible with the role of courts in the administration of justice.

Read in light of the traditional duties imposed on an attorney, it is clear that "conduct unbecoming a member of the bar" is conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice. More specific guidance is provided by case law, applicable court rules, and "the lore of the profession," as embodied in codes of professional conduct.[6]

## B

Apparently relying on an attorney's obligation to avoid conduct that is "prejudicial to the administration of justice,"[7] the Court of Appeals held that the letter of October 6, 1983,

---

[6] The Court of Appeals stated that the standard of professional conduct expected of an attorney is defined by the ethical code adopted by the licensing authority of an attorney's home state, 734 F. 2d, at 336, n. 4, and cited the North Dakota Code of Professional Responsibility as the controlling expression of the conduct expected of petitioner. The state code of professional responsibility does not by its own terms apply to sanctions in the federal courts. Federal courts admit and suspend attorneys as an exercise of their inherent power; the standards imposed are a matter of federal law. *Hertz* v. *United States*, 18 F. 2d 52, 54–55 (CA8 1927).

The Court of Appeals was entitled, however, to charge petitioner with the knowledge of and the duty to conform to the state code of professional responsibility. The uniform first step for admission to any federal court is admission to a state court. The federal court is entitled to rely on the attorney's knowledge of the state code of professional conduct applicable in that state court; the provision that suspension in any other court of record creates a basis for a show cause hearing indicates that Rule 46 anticipates continued compliance with the state code of conduct.

[7] 734 F. 2d, at 336–337. This duty is almost universally recognized in American jurisdictions. See, *e. g.*, Disciplinary Rule 1–102(A)(5), North Dakota Code of Professional Responsibility; Rule 8.4(d), American Bar Association, Model Rules of Professional Conduct (1983); Disciplinary Rule 1–102(A)(5), American Bar Association, Model Code of Professional Responsibility (1980).

and an unspecified "refusal to show continuing respect for the court" demonstrated that petitioner was "not presently fit to practice law in the federal courts." 734 F. 2d, at 337. Its holding was predicated on a specific finding that petitioner's "disrespectful statements [in his letter of October 6, 1983] as to this court's administration of the CJA [constituted] contumacious conduct." *Ibid.*

We must examine the record in light of Rule 46 to determine whether the Court of Appeals' action is supported by the evidence. In the letter, petitioner declined to submit further documentation in support of his fee request, refused to accept further assignments under the Criminal Justice Act, and criticized the administration of the Act. Petitioner's refusal to submit further documentation in support of his fee request could afford a basis for declining to award a fee; however, the submission of adequate documentation was only a prerequisite to the collection of his fee, not an affirmative obligation required by his duties to a client or the court. Nor, as the Court of Appeals ultimately concluded, was petitioner legally obligated under the terms of the local plan to accept Criminal Justice Act cases.

We do not consider a lawyer's criticism of the administration of the Act or criticism of inequities in assignments under the Act as cause for discipline or suspension. The letter was addressed to a court employee charged with administrative responsibilities, and concerned a practical matter in the administration of the Act. The Court of Appeals acknowledged that petitioner brought to light concerns about the administration of the plan that had "merit," 734 F. 2d, at 339, and the court instituted a study of the administration of the Criminal Justice Act as a result of petitioner's complaint. Officers of the court may appropriately express criticism on such matters.

The record indicates the Court of Appeals was concerned about the tone of the letter; petitioner concedes that the tone of his letter was "harsh," and, indeed it can be read as ill-

mannered. All persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants. The necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone. However, even assuming that the letter exhibited an unlawyerlike rudeness, a single incident of rudeness or lack of professional courtesy—in this context—does not support a finding of contemptuous or contumacious conduct, or a finding that a lawyer is "not presently fit to practice law in the federal courts." Nor does it rise to the level of "conduct unbecoming a member of the bar" warranting suspension from practice.

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN took no part in the decision of this case.