**In re James FINKELSTEIN.**

**Misc. Civ. A. No. 89–2–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 9, 1989.

Eugene C. Black, Jr., Henry C. Custer, Albany, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

On or about September 6, 1988, the case captioned *Ross, et al. v. Buckeye Cellulose Corp.* began before Judge Duross Fitzpatrick in the United States District Court for the Middle District of Georgia. The consolidated action involved eleven plaintiffs who were alleging violations of 42 U.S.C. § 1981. After a long and acrimonious trial, the jury returned verdicts on or about December 21, 1988, imposing liability upon defendant for its conduct toward two of the eleven plaintiffs, Mr. Issiah Ross, Jr., and Mr. Gerry Plant. In the other nine cases, the jury returned verdicts in favor of defendant.[1] The court set January 6, 1989, as the day on which the damages portion of the case would begin. Judge Fitzpatrick suggested that the parties use the interim to discuss settlement.

During the early morning hours of December 22, 1988, upon returning home following the jury verdicts, attorney for plaintiffs, Mr. James Finkelstein, composed a letter to Mr. Powell McHenry, general counsel for the Procter & Gamble Company.[2] Mr. McHenry had not been involved in the trial of the cases. Defendant had been and still was represented by attorneys John Skinner and Steve Jemison. Mr. Finkelstein's letter, attached as an Appendix to this order, was dated December 24,

---

1. Title VII claims were and still are outstanding. Judge Duross Fitzpatrick, the presiding judge during the long trial, will render a decision on those claims at some future time.

2. Buckeye Cellulose, defendant in the above-mentioned actions, is now the Procter & Gamble Cellulose Company and is within the umbrella of the Procter & Gamble Company.

1988, and was the third letter written by Mr. Finkelstein to Mr. McHenry which bypassed trial counsel, Mr. Skinner and Mr. Jemison. Mr. McHenry responded by letter dated January 3, 1988, copying Judge Fitzpatrick and attaching to Judge Fitzpatrick's copy a reproduction of Mr. Finkelstein's letter. Upon being shown the letter by Judge Fitzpatrick, this court issued a show cause order on January 5, 1989, requiring Mr. Finkelstein to appear and show cause why he should not be disbarred from the bar of this court because of the apparent unprofessional conduct exemplified by the December 24 letter.

This court conducted a hearing on February 2, 1989, during which Mr. Skinner and Mr. Finkelstein testified. Mr. Skinner explained that he had served as and remained lead counsel for defendant. His testimony, combined with that of Mr. Finkelstein, established that an absence of professional courtesy had pervaded this litigation. Mr. Finkelstein further explained that his letter of December 24 to Mr. McHenry was an attempt to negotiate a settlement with the individual who he (Mr. Finkelstein) perceived as having the authority to do so. He also stated that he at no time intended his letter to be read as a threat. He testified that he probably would not express his views in a similar fashion if he had the opportunity to rewrite the letter, but Mr. Finkelstein stopped short of expressing regret for the letter or its tone.

### The Applicable Law

"Courts have long recognized an inherent authority to suspend or disbar lawyers." *In re Snyder*, 472 U.S. 634, 643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504, 512 (1985). "This inherent power derives from the lawyer's role as an officer of the court which granted admission." *Id.* at 643, 105 S.Ct. at 2880, 86 L.Ed.2d at 512. While a federal court is entitled to charge an attorney with the knowledge of and the duty to conform to the state bar's code of professional responsibility, that code does not by its own terms apply to sanctions in the federal courts. "Federal courts admit and suspend attorneys as an exercise of their inherent power; the standards imposed are a matter of federal law." *Id.* at 645 n. 6, 105 S.Ct. at 2881 n. 6, 86 L.Ed.2d at 513 n. 6.

### Respondent's Conduct

Several aspects of Mr. Finkelstein's letter trouble this court. First, the December 24 letter from Mr. Finkelstein to Mr. McHenry is the third such letter bypassing defendant's designated counsel. Though Mr. McHenry is an attorney and is general counsel for Procter & Gamble, this court questions the propriety of "leapfrogging" defendant's trial counsel, Mr. Skinner and Mr. Jemison, particularly in light of Mr. McHenry's admonition in his response to an earlier letter from respondent Finkelstein. "[I]f you [Mr. Finkelstein] have any desire to pursue settlement, you are quite correct in suggesting that you should talk to Mr. Skinner and Mr. Jemison." November 16, 1988, Letter from Mr. Powell McHenry to Mr. James Finkelstein. Ethical Consideration 7–18 of the Model Code of Professional Responsibility, as adopted by the State Bar of Georgia, provides that "a lawyer should not communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer...." Disciplinary Rule 7–104(A)(1) states that a lawyer shall not "communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter...." *See United States v. Dennis*, 645 F.2d 517, 523 (5th Cir.1981) (lawyer representing a party in a controversy is prohibited from directly contacting the opposing party if he knows that opposing party is represented by counsel). Though he is an attorney, Mr. McHenry is also an officer with Procter & Gamble Company, and he made it clear to Mr. Finkelstein that the appropriate persons with whom to conduct settlement negotiations were Mr. Skinner and Mr. Jemison. Without determining whether Mr. McHenry was an "attorney" or a "client" for the purposes of this case, the court believes that respondent's communication with Mr. McHenry was improper in light of the attendant circumstances.

A second concern, and one interrelated with the ethical consideration discussed above, goes to the representations made by Mr. Finkelstein to Mr. McHenry regarding the past course of the trial and the forthcoming rulings expected from Judge Fitzpatrick. The prohibition against communicating with an opposing party serves to shield opposing litigants not only from an attorney's intentionally improper approaches but also from well-intended but misguided advances. *See* Annotation, Communication with party represented by counsel as ground for disciplining attorney, 26 A.L.R.4th 102, 112 (1983). In his December 24 letter, respondent has represented to Mr. McHenry (1) the significance of the jury's verdicts, (2) the supposed concession by defendant of plaintiffs' Title VII claims and Judge Fitzpatrick's forthcoming favorable ruling to that effect, (3) a recitation of what the evidence purportedly will show in the upcoming portions of the case, and (4) a proposal for injunctive relief with the suggestion that defendant have respondent approve any proposed system for measuring job performance. These observations, representations, and predictions, true or not, are presented to Mr. McHenry in a one-sided fashion which deprives Mr. McHenry of the benefit of the insights and observations of attorneys hired to represent Procter & Gamble, attorneys who have been present during the long trial of these cases and who most likely have valuable input regarding any decisions yet to be made. "The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel." Model Code of Professional Responsibility EC 7–18.

Third, this court finds reprehensible that portion of respondent's letter in which he requests five hundred thousand dollars ($500,000.00) in attorney's fees. He states that "[r]egardless of the outcome of these settlement negotiations, I am entitled to fees for the time spent on the trial and trial preparation—which is somewhere around

1500 hours for me, over 400 hours for my expert witness, and several hundred [hours] for support staff...."

To qualify as a prevailing party under 42 U.S.C. § 1988,[3] and thus to be entitled to attorney's fees under that section, "the plaintiff must be successful on the central issue in the case, exhibited by the fact that the plaintiff acquired the primary relief sought." *Taylor v. City of Fort Lauderdale*, 810 F.2d 1551, 1555–56 (11th Cir. 1987). While prevailing parties should ordinarily recover attorney's fees, the decision on whether to award attorney's fees is made by the district court. *Taylor*, 810 F.2d at 1556. Based upon both the statute and the precedent in this circuit, this court finds respondent's statements regarding the award of attorney's fees at best presumptuous and at worst incorrect.

■ The court also notes that any attorney's fees must be apportioned in that the time spent on unsuccessful claims must be excluded. *Trezevant v. City of Tampa*, 741 F.2d 336, 341 (11th Cir.1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct.1933, 76 L.Ed.2d 40 (1983). Considering that but two of respondent's clients have thus far prevailed, it seems unlikely that all of the time and preparation described by Mr. Finkelstein will be compensable. Thus, respondent's statements to Mr. McHenry mischaracterize the issue of attorney's fees.

As stated previously, many aspects of Mr. Finkelstein's letter disturb this court. The above-discussed points, however, provide but an introduction to the conduct which this court finds particularly egregious and clearly unprofessional and unethical. Beginning on page 4 of his letter, Mr. Finkelstein "suggests" several reasons why defendant Procter & Gamble should accept his settlement proposals. These "suggestions," beginning with number four, read as follows:

(4) The NAACP and SCLC might find it interesting that your company fought

---

**3.** 42 U.S.C. § 1988 reads in relevant part as follows: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title ... *the court, in its discre-* *tion, may allow the prevailing party ... a reasonable attorney's fee* as part of the costs." (emphasis added).

hard and successfully to keep testimony from the jury in this case that a black manager at your Foley, Florida plant had to hold his urine all day to avoid the racial epithets on the walls of the restroom, the pounding on the stalls when he used the restroom, and the objects thrown over the sides of the stalls when he used the restroom. They would also find it interesting that he had to wear his hard hat to keep from being injured from debris thrown at him by white workers;

(5) A young lady I grew up with in Johnstown, Pennsylvania named Lucy Spiegel is interested in good stories when I bump into her at home—she formerly was a producer for 60 Minutes and now is a producer for ABC news;

(6) Any company which spends $1.6 billion per year on advertising would not be enthusiastic over nationwide publicity that it has been found guilty of intentional race discrimination;

(7) There are more cases coming, and not only at your Oglethorpe, Georgia plant; I have been contacted by other persons charging race discrimination and those cases are being prepared for filing;

(8) If a settlement is not reached, my clients plan on letting the other employees at other plants owned by your company know that if they are victims of race discrimination, they can speak up or file discrimination charges—and Procter & Gamble will lose in court if it tries to retaliate against them;

(9) If a settlement is not reached, I plan to contact some local union organizers and send them out to the Oglethorpe plant [my understanding is that many of the white employees at Flint River are as upset as the black employees over the pay and progression system];

(10) If only one person out of ten in America (roughly equal to the black population of this country) bought Procter & Gamble's competitors' products on only one trip to the grocery store (say $4.00 worth), the gross sales of Procter & Gamble would be reduced by about $100,-000,000.00. I know for a company grossing over $19 billion per year that that is not much. But it would be a nice state-ment against buying products from a company which will pay hundreds of thousands of dollars and fight for years for its opportunity to practice racial discrimination in its plants.

These suggestions can only be read as threats, threats which attempt to remove the resolution of disputes from the constitutionally established courts of the United States and the open and orderly processes established therein and which serve to replace the concept of resolution on the merits to resolution by extortion. Respondent, by his letter, has improperly injected the judicial process with pressure group politics, an act which amounts to conduct unbecoming a member of the bar. Even more disturbing is respondent's timing, that is, he has resorted to these tactics *after* a trial on the merits had resulted in a verdict of limited liability against defendant. Such conduct is "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice." *In re Snyder*, 472 U.S. at 645, 105 S.Ct. at 2881, 86 L.Ed. 2d at 513.

> As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice.

*Id.* at 644–45, 105 S.Ct. at 2880–81, 86 L.Ed.2d at 513.

In the case just cited, *In re Snyder*, the Supreme Court reversed the judgment of the Court of Appeals for the Eighth Circuit

suspending an attorney from practicing in the Eighth Circuit for a period of six months. The Eighth Circuit's actions were predicated upon a letter written by an attorney in which he criticized the fees authorized under the Criminal Justice Act, 18 U.S.C. § 3006A, and the Eighth Circuit's administration of that Act. The Supreme Court held that neither the attorney's refusal to submit additional information in support of his fee request nor his harsh criticism of the administration of the Act warranted the imposition of discipline. The Court stated as follows:

> All persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants. The necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone. However, even assuming that the letter exhibited an unlawyerlike rudeness, a single incident of rudeness or lack of professional courtesy—in this context—does not support a finding of contemptuous or contumacious conduct, or a finding that a lawyer is "not presently fit to practice law in the federal courts." Nor does it rise to the level of "conduct unbecoming a member of the bar" warranting suspension from practice.

Id. at 647, 105 S.Ct. at 2882, 86 L.Ed.2d at 514.

The conduct of respondent as exhibited by the December 24 letter extends beyond rudeness or an absence of professional courtesy. The threatening implications in the letter disrupt the judicial process and are inimical to the administration of justice. Such conduct cannot be ignored.

### Conclusion

 In accordance with the foregoing discussion, this court determines that Mr. James Finkelstein should be SUSPENDED from the practice of law in the federal courts in the Middle District of Georgia for a period of six months.[4] Respondent's suspension shall begin upon the conclusion of the *Ross* case in the district court. That case shall be deemed concluded upon the entering of the judgment or upon the filing of any notice of appeal, if any. Under no circumstances shall the suspension take effect any later than thirty days from the date judgment is entered.

The clerk of this court is directed to examine the files and to identify all of those pending cases in which respondent is the attorney of record. The clerk is directed to notify respondent's clients in those pending cases by letter of this court's action and to inform them that if such suspension is injurious to their cause of action they should immediately notify this court.[5]

---

**4.** Upon the commencement of the hearing, respondent's counsel stated that the show cause order failed to inform respondent of the charges against him and thus failed to comply with the requirements of procedural due process. *See In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed. 2d 117 (1968). The show cause order informed respondent that the focus of the court's inquiry involved "unprofessional conduct" as "exemplified by respondent's letter of December 24, 1988...." During the hearing, respondent and his counsel addressed each of the issues discussed above in the court's order, thus making clear that the show cause order of January 5, 1989, properly noticed respondent of the nature of the charge against him. Specifically, respondent attempted to discount the threatening character of the letter, the particular aspect of the letter upon which the court bases the disciplinary action taken. Thus, the court finds respondent's allegation that the show cause order failed to comply with due process without merit.

**5.** On the date of this order, the clerk has identified the following cases in which respondent is identified as counsel of record:

(1) 86–80–ALB–AMER—Vincson Herren and Woody Eugene Herren v. E.J. Bowyer, individually and in his capacity as Sheriff of Lee County, Georgia;

(2) 87–57–ALB–AMER—Aretha S. Baker v. Buckeye Cellulose Corp.;

(3) 87–145–ALB–AMER—Adolph Toombs v. Mickey Gordon, Marvin Hicks, David Forrester, and City of Camilla, Georgia;

(4) 87–200–ALB–AMER—Kareem Aquil, et al., v. Jamil Saba, Sheriff, et al.;

(5) 88–125–ALB–AMER—William Morgan Porter v. Trustees, Procter and Gamble Disability Benefit Plan and Buckeye Cellulose Corp.; and,

(6) 88–227–ALB–AMER—Snydergeneral Corp. v. Jimmy M. Bradford, d/b/a Bradford Electric Company.

Upon receipt of such notification, this court will locate competent counsel to enable them to proceed on their claims.

SO ORDERED.

## APPENDIX

### JAMES FINKELSTEIN

ATTORNEY AT LAW

414 MEADOWLARK DRIVE

ALBANY, GEORGIA 31707

PHONE (912) 436–7824

December 24, 1988

Mr. Powell McHenry
General Counsel
Procter & Gamble
P.O. Box 599
Cincinnati, Ohio 45201

RE: Slaughter et al. v. Buckeye Cellulose
United States District Court, M.D. Ga.

Dear Mr. McHenry:

As you may have heard, the 42 U.S.C. Sec. 1981 cases have been tried on the issue of liability in the United States District Court for the Middle District of Georgia. The jury found that Buckeye Cellulose—now Procter & Gamble Cellulose—was liable for intentional discrimination against two of the plaintiffs, Mr. Issiah Ross, Jr. and Mr. Gerry Plant. Specifically, they found the company intentionally fired Mr. Ross because of his race; it intentionally fired him to retaliate against him for bringing to the attention of the company the fact that black employees were being discriminated against because of their race; and it intentionally discriminated against him because of his race with regard to the terms and conditions of his employment. The jury also found that Mr. Plant was a victim of intentional race discrimination in terms of his pay.

The jury was composed of 11 whites and one black person and the verdicts were not the result of anything other than the overwhelming evidence presented in Mr. Ross's and Mr. Plant's cases. The next phase of the trial is the damages phase. After that, Judge Duross Fitzpatrick will decide the Title VII claims for all thirteen plaintiffs whose cases were tried these last four months. Since Procter & Gamble introduced none of the evidence required to rebut the Title VII claims, it seems that these have been conceded by the company. [Specifically, the company had to tie together the policies having a disparate impact on blacks—such as career planning, qualification boards, etc.—with a "business necessity" for the use of those policies. Since the plant manager specifically testified that they had to terminate those policies because of business necessity, it appears that the company has punted on these issues and conceded Title VII to the Plaintiffs.]

Judge Fitzpatrick has suggested that if we can work out a settlement in the above cases, we attempt to do so. Following are proposals for all of my clients, including Jerry Powell and Aretha Baker, whose cases have not yet been tried, and excluding Mr. Vernon Putman, whom I have not been able to reach as of this writing, and Mr. Eddie Slaughter.

Mr. Issiah Ross, Jr. will agree to settle the money damages portion of his case for $1.5 million. Mr. Gerry Plant will settle his for $500,000.00. [The damages phase of the trial on January 6, 1989 will include back pay, emotional distress, humiliation and embarrassment, and punitive damages.]

Mr. William Porter, fired in July of 1986 while he was disabled from working, presently has pending an E.R.I.S.A. lawsuit in the same court, as well as his Title VII claims for race discrimination under several theories of disparate impact. As your trial counsel may have advised you, at the time Mr. Porter was cut off from his disability benefits in April of 1986, he was completely disabled, a disability certificate had been presented to Buckeye, and the plant doctor had information in his file which precisely explained his disability—Mr. Porter had an allergic reaction to the iodine injected into his spinal fluid during a myelogram administered in February of 1986.

Mr. Porter was then hospitalized and put in traction for over a week. After his release he was confined to his bed. By June of 1986 he could walk only with a cane. He was also in extreme pain in June of 1986. [This last testimony came from the company's witness, Mr. Bob Mosely.] For reasons best known to your plant doctor, he recommended that Mr. Porter be completely cut off from disability benefits on April 1, 1986, on the basis that Mr. Porter could return to light duty. However, Dr. Dean never examined Mr. Porter after his myelogram and never spoke to Mr. Porter's physicians between the time of his myelogram and the time he was cut off from his disability benefits. How or why he determined Mr. Porter was able to return to light duty is beyond my ken.

The only documentary evidence from physicians presented on behalf of the theory that Mr. Porter could return to work were two letters—one from a specialist who said the causes of Mr. Porter's pain could not yet be determined. The other letter, dated July of 1986, was from a neurologist who said that Mr. Porter could return to light duty "if he can stand the pain." The second letter was received after Mr. Porter was fired and was not the basis for the decision to fire him.

I mention the evidence because in my opinion Mr. Porter will either win his E.R.I.S.A. suit, his Title VII claim, or a judgment n. o. v. or new trial on the Sec.1981 verdict. If he wins only one of those, he gets damages and his job back. Procter & Gamble will get a somewhat tarnished image for its treatment of a disabled black employee who had correctly pointed out that the company was guilty of race discrimination.

Mr. Porter will settle his remaining cases upon restoration of his job (a "pain block" operation in 1987 enables him to work again) and $250,000.00 in damages.

The other plaintiffs, excluding Mr. Slaughter and Mr. Vernon Putman, will settle the money damages portion of their claims upon payment of $150,000.00.

Regarding injunctive relief—that is, the relief that Mr. Ross and Mr. Plant are entitled to under Sec.1981 and the other plaintiffs will be entitled to when the Title VII claims are decided in their favor—I have a few proposals. First, until Procter & Gamble can come up with an objective nondiscriminatory system for measuring job performance, put all technicians below curve 4 salary (presently $596.00 per week) on curve 4. Restore all pay cuts to employees whose pay has been cut under the new pay system. As far as I know all of those with pay cuts were white—and some of them feel the employees who filed charges of discrimination were the causes of their pay cuts.

When you do have an objective and fair proposed system for measuring job performance, please run it by me first. I will have my clients and other employees critique it for you. You may not know it, but according to employees I have spoken to (not my clients) the current system of peer performance evaluations at the plant is a farce. Employees are almost openly making deals for favorable evaluations and tests from each other.

Interestingly enough, the current system has fostered closer cooperation between black and white employees, since their deals have to cross racial boundaries to be successful.

Regarding my attorney's fees, I believe that $500,000.00 would be fair at this juncture if no further litigation is pursued by Procter & Gamble. [Regardless of the outcome of these settlement negotiations, I am entitled to fees for the time spent on the trial and trial preparation—which is somewhere around 1500 hours for me, over 400 hours for my expert witness, and several hundred for support staff, including two law students who worked on the case.] If you want to quibble over this amount, I would probably be willing to settle for the total amount you have paid to Smith, Currie & Hancock since June of 1985.

You may ask me why Procter & Gamble should settle these cases at this juncture. That is a good question. Some answers which presently suggest themselves are:

(1) I intend to do everything I can to obtain jury verdicts at the damages

phase which will at least double the above amounts totaled—I have a few aces up my sleeve to play in the damages phase, courtesy of trial testimony from Mr. Richards, Mr. Sichelstiel, and Mr. Hooper;

(2) I intend to obtain Title VII damages for all plaintiffs and E.R.I.S.A. damages for Mr. Porter which will come close to the above amounts, although the attorney's fees should be higher;

(3) Any company which has the hubris to sue for libel over the moon and stars logo has some concern for its public image, and more litigation will only tarnish the image further;

(4) The NAACP and SCLC might find it interesting that your company fought hard and successfully to keep testimony from the jury in this case that a black manager at your Foley, Florida plant had to hold his urine all day to avoid the racial epithets on the walls of the restroom, the pounding on the stalls when he used the restroom, and the objects thrown over the sides of the stalls when he used the restroom. They would also find it interesting that he had to wear his hard hat to keep from being injured from debris thrown at him by white workers;

(5) A young lady I grew up with in Johnstown, Pennsylvania named Lucy Spiegel is interested in good stories when I bump into her at home—she formerly was a producer for 60 Minutes and now is a producer for ABC news;

(6) Any company which spends $1.6 billion per year on advertising would not be enthusiastic over nationwide publicity that it has been found guilty of intentional race discrimination;

(7) There are more cases coming, and not only at your Oglethorpe, Georgia plant; I have been contacted by other persons charging race discrimination and those cases are being prepared for filing;

(8) if a settlement is not reached, my clients plan on letting the other employees at other plants owned by your company know that if they are victims of race discrimination, they can speak up or file discrimination charges—and Procter & Gamble will lose in court if it tries to retaliate against them;

(9) if a settlement is not reached, I plan to contact some local union organizers and send them out to the Oglethorpe plant [my understanding is that many of the white employees at Flint River are as upset as the black employees over the pay and progression system];

(10) If only one person out of ten in America (roughly equal to the black population of this country) bought Procter & Gamble's competitors' products on only one trip to the grocery store (say $4.00 worth), the gross sales of Procter & Gamble would be reduced by about $100,-000,000.00. I know for a company grossing over $19 billion per year that that is not much. But it would be a nice statement against buying products from a company which will pay hundreds of thousands of dollars and fight for years for its opportunity to practice racial discrimination in its plants.

These proposals may make you feel defensive or even outraged. But my clients have put up with unbelievable pressures for the past four years in the name of racial justice. I think they deserve to work in an environment free of racial discrimination. I also think they deserve to receive monetary compensation for the tangible and intangible losses they and their families have endured in order to stand up for their principles.

These offers will be open for acceptance until 9:30 A.M. on January 6, 1989, after which they will terminate.

Thank you for your cooperation in this matter.

Sincerely yours,
/s/ James Finkelstein
James Finkelstein

pc: all clients
 Mr. John Skinner