NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-508

COMMONWEALTH

vs.

JOSEPH RODRIGUEZ.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A grand jury indicted the defendant, Joseph Rodriguez, on twenty-one charges of rape, assault and battery, strangulation or suffocation, threats, and various other crimes arising from separate incidents involving two unrelated female victims, A.H. and B.G.[1]  The eight indictments relating to B.G. were tried separately to a jury, resulting in seven guilty verdicts -- for rape, assault with intent to commit rape, strangulation or suffocation, assault and battery by means of a dangerous weapon,

_____

[1] The crimes charged in indictments 1 through 11, involving A.H., all occurred on August 25, 2020.  The crimes charged in indictments 20 and 21 occurred on the same day; A.H.'s boyfriend was the victim.  The crimes charged in indictments 12 through 19, involving B.G., occurred four days later, on August 29, 2020.

assault and battery (two charges), and threats -- and acquittal on one indictment charging assault and battery. The defendant appeals from the seven judgments of conviction,[2] arguing that the trial judge abused his discretion by allowing the Commonwealth to present prior bad act evidence through A.H. We affirm.

1. Background. a. Procedural history. After arraignment, the defendant moved for relief from prejudicial joinder and a motion judge severed the eight indictments relating to B.G. from the other thirteen indictments. The Commonwealth elected to try the indictments involving B.G. first. The Commonwealth filed a motion in limine to introduce evidence of the defendant's prior bad acts through the testimony of A.H. and C.B., another alleged victim. The Commonwealth argued that the testimony of the two prior victims should be allowed because it was probative of the defendant's motive, criminal intent, and pattern of conduct, and of the victim's lack of consent. The defendant opposed the motion, arguing that the testimony was more prejudicial than probative and that its admission would negate any chance of him receiving a fair trial, which was precisely the reason the motion judge had allowed the defendant's motion to sever. In a written decision, the trial

---

[2] Indictments 1 through 11, 20, and 21 were resolved by guilty pleas several months after the trial on indictments 12 through 19 and are not relevant to this appeal.

judge, who was not the motion judge, ruled that A.H.'s testimony was admissible because it was close in time, probative of a common course of conduct by the defendant, and served to corroborate B.G.'s testimony. The judge excluded C.B.'s testimony, however, as "too remote in time" and "lack[ing] sufficient similar facts."

b. The charged conduct. B.G. knew the defendant from high school. They never dated, but she did have a crush on him. The two lost touch but reconnected over social media in 2020 while the defendant was living in Missouri. In the summer of 2020, the defendant sent B.G. a text message telling her that he was in Taunton, and they made plans to see each other in August. The first time they met they went to B.G.'s house, smoked marijuana, and reminisced about high school. Two days later they met again and ran errands. The defendant gave her a book on Tarot cards and they went back to her house where they had "typical sexual intercourse." A few days later they met for a third time. They picked up food and alcohol then went back to B.G.'s house where they watched television. The defendant drank an entire bottle of liquor. B.G. had a few sips but preferred to smoke marijuana. Eventually, they went into her bedroom and "were kind of just fooling around" but did not have sexual intercourse. The defendant began getting rough with B.G. and

3

called her a pig. To calm him down, she suggested they take a shower.

While in the shower the defendant repeatedly spit on B.G. and threatened her. When she asked him to stop, his behavior became more aggressive. His eyes suddenly "went all black" and "[h]e looked like the devil." He continued calling her names, threatened to kill her, and smashed her head against the glass shower door. She got out of the shower and he chased her into the bedroom, pinned her on the bed, and strangled her. At some point, he put something "long and skinny" in her anus. She eventually blacked out. When she woke up, her television and laundry hamper had been smashed in half and the defendant was repeatedly threatening to kill her. At one point the defendant fell, and B.G. was able to run to a neighbor's house and call the police.

B.G.'s testimony was corroborated by eleven other witnesses -- including a first complaint witness, responding and investigating police officers, a civilian investigator, the victim's mother, a sexual assault nurse examiner, and forensic scientists -- as well as photographs, medical records, and forensic test results.

c. Prior bad act evidence. A.H. testified that she and the defendant had dated in middle school, lost touch, and then reconnected via social media. In the summer of 2020, the

4

defendant told her that he would be visiting Taunton and that he needed a place to stay.  A.H. was initially apprehensive about letting him stay with her but eventually agreed.  During the three weeks the defendant stayed with A.H. their relationship remained platonic, with him sleeping in the living room on a recliner.  One night -- four days before the defendant's rape and assault of B.G. -- the defendant and A.H. were drinking alcohol and having a casual conversation when suddenly the defendant's "eyes changed" and "[i]t was like he wasn't there anymore."

The defendant became violent and grabbed A.H. by her hair. He dragged her to the bedroom, spit on her, then raped her. During the attack, he made a derogatory comment about her weight.  At some point, the defendant stopped to look for his phone and passed out on the floor.  A.H. ran outside and called a friend to come pick her up.  When the friend declined, she went back inside the apartment to retrieve her car keys.  The defendant, who was then awake and angry, grabbed her by the neck, pushed her against a wall, and strangled her.  He said "he could drive [A.H.] around in the trunk of [her] car for two weeks and nobody would know."  Eventually, A.H.'s friend showed up, and the police arrived shortly after.  After she was taken to the hospital and examined, A.H. returned home to find everything in her apartment "flipped upside down."

5

2.  Discussion.  The defendant argues that the trial judge "legally did take leave of [his] senses" by admitting A.H.'s testimony and "made it impossible for the jury to assess the . . . relevant evidence in this case."[3]  We disagree.

"It is well settled that the prosecution may not introduce evidence of a defendant's prior or subsequent bad acts for the purpose of demonstrating bad character or propensity to commit the crime charged."  Commonwealth v. Barrett, 418 Mass. 788, 793 (1994).  "Such evidence may, however, 'be admissible for another purpose,' such as to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'"  Commonwealth v. Peno, 485 Mass. 378, 385 (2020), quoting Mass. G. Evid. § 404(b)(2).

"[E]ven if offered for a permissible purpose, bad act evidence nevertheless is inadmissible where 'its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk.'"  Commonwealth v. Correia, 492 Mass. 220, 228-229 (2023), quoting

---

[3] We recognize that "[o]fficers of the court may appropriately express criticism" of the judicial process and the law, In re Snyder, 472 U.S. 634, 646 (1985), and that counsel was paraphrasing case law (which has since been repudiated).  We remind counsel, however, that "[t]he necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone."  Id. at 647.

Mass. G. Evid. § 404(b)(2).  Determining relevance and weighing probative value against the risk of undue prejudice "are left to the sound discretion of the trial judge," Commonwealth v. West, 487 Mass. 794, 805 (2021), and the judge's decision will be affirmed "unless the judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  Id. at 805-806.  Factors to be considered include (1) "whether the trial judge carefully weighed the probative value and prejudicial effect of the evidence to be introduced"; (2) the use of limiting instructions; (3) "whether the challenged evidence was cumulative . . . thereby reducing the risk of any additional prejudicial effect; and (4) whether the challenged evidence was so similar to the charged offense that it increased the risk of propensity reasoning by the jury" (quotation and citation omitted).  Commonwealth v. MacCormack, 491 Mass. 848, 863 (2023).

The trial judge carefully weighed the evidence.  In his memorandum of decision on the motion in limine, the judge, quoting Barrett, 418 Mass. at 794, found that A.H.'s prior bad act evidence was "closely related in time, place, and form of acts to show a common course of conduct by the defendant . . . so as to be logically probative."  Although the judge did not

7

specifically address his weighing of prejudice versus probative value, his finding that the risk of unfair prejudice did not outweigh the probative value of A.H.'s testimony was implicit in his ruling. See Commonwealth v. Samia, 492 Mass. 135, 148 (2023), quoting Commonwealth v. Mahan, 18 Mass. App. Ct. 738, 741 n.1 (1984) (while "not the best practice," judge's failure to conduct balancing on record "not fatal" because "[s]uch a determination is implicit in the judge's consideration of the tender of, and the objection to, the evidence and the judge's ultimate decision to admit it"). The implicit weighing is apparent in the fact that the judge denied the Commonwealth's motion in part and excluded C.B.'s proffered testimony, necessarily finding it to be more prejudicial than probative. He also refused to allow the Commonwealth to put on two additional witnesses to corroborate A.H.'s testimony, firmly stating that "the prior bad act [evidence] ends with this witness." "This is not a case where the judge failed to exercise any discretion by making no effort at all to scrutinize the contested evidence" (quotation and citation omitted). West, 487 Mass. at 807.

The judge also took care to mitigate any risk that the jury might misuse the prior bad act evidence by providing forceful, detailed limiting instructions. The judge gave limiting instructions regarding the use of A.H.'s prior bad act testimony

8

four separate times -- during his preliminary charge, both in the middle of and immediately after A.H.'s testimony, and in the final charge -- pointedly telling the jury that the evidence was not a substitute for proof that the defendant committed the crimes charged, that they may not consider it as proof that he had criminal propensity or a bad character, and that they may not use it to conclude that if he had committed the prior bad acts he must have also committed the crimes charged.  He "was aware of this issue early in the proceedings and monitored the development of the evidence closely," Commonwealth v. Copney, 468 Mass. 405, 414 (2014), and followed the favored practice of giving "contemporaneous limiting instructions," Commonwealth v. Facella, 478 Mass. 393, 402 (2017), as well as giving the limiting instruction at the beginning and end of the trial.  See Commonwealth v. Walker, 442 Mass. 185, 202 (2004) (risk of prejudice from prior bad act testimony "sufficiently ameliorated by the judge's limiting instructions, given immediately after the testimony and repeated during the final instructions").

A.H.'s testimony was somewhat cumulative of the evidence concerning the defendant's assault on B.G., thus mitigating its prejudicial effect.  Her testimony included several elements already in evidence concerning the assault on B.G., such as the drastic effect that alcohol had on the defendant, his destruction of property, and his extreme sexual violence.

9

Having already heard similar evidence from B.G. and other witnesses to her assault, the jury would not have been shocked, or unduly prejudiced, by A.H.'s account of such conduct.

Finally, the incident A.H. described was similar to the crimes charged involving B.G. -- A.H.'s testimony would not have been admissible to show a pattern of conduct or be relevant to the defendant's motive and the victim's lack of consent if it was not. The fact that the incidents took place only four days apart and that, in both incidents, the defendant's behavior changed markedly after excessive drinking created a "temporal and schematic nexus" that bore on the defendant's state of mind and provided an explanation for his seemingly inexplicable change in temperament. Commonwealth v. Hanlon, 44 Mass. App. Ct. 810, 818 (1998), quoting Barrett, 418 Mass. at 794. Likewise, the evidence suggested a pattern of conduct that tended to refute any suggestion that B.G., who had previously had consensual sex with the defendant, consented to the violent sexual activity charged in the indictments. See Commonwealth v. Pillai, 445 Mass. 175, 183 (2005), quoting Commonwealth v. King, 387 Mass. 464, 472 (1982) (evidence of similarities admissible to corroborate victim's testimony and "render[] it not improbable that the acts charged might have occurred"). In sexual assault cases, similar conduct is admissible in the judge's discretion:

"One of the recognized exceptions invariably followed in this Commonwealth is that, when a defendant is charged with any form of illicit sexual intercourse, evidence of the commission of similar crimes by the same parties though committed in another place, if not too remote in time, is competent to prove an inclination to commit the [acts] charged in the indictment . . . and is relevant to show the probable existence of the same passion or emotion at the time in issue."

King, supra at 469-470, quoting Commonwealth v. Bemis, 242 Mass. 582, 585 (1922).

But A.H.'s testimony was not so similar that the jury would necessarily have engaged in propensity thinking. "Notwithstanding the defendant's contention, the prior bad act evidence did not overwhelm the case." West, 487 Mass. at 808. Twelve witnesses testified about the attack on B.G., while evidence of the prior bad act was limited to the testimony of a single witness -- and the jury were guided by repeated limiting instructions. The judge did not abuse his discretion in admitting A.H.'s testimony.

Judgments affirmed.

By the Court (Massing, Hershfang & Tan, JJ.[4]),

Clerk

Entered:  March 14, 2025.

---

[4] The panelists are listed in order of seniority.

11