MACDRAW, INC., Plaintiff,

v.

THE CIT GROUP EQUIPMENT FINANCING, INC. and Richard Johnston, Defendants.

No. 91 Civ. 5153(DC).

United States District Court, S.D. New York.

Feb. 5, 1997.

Ramsey Clark, Lawrence W. Schilling, New York City, for Respondents Larry Klayman and Paul J. Orfanedes.

Larry Klayman, Paul J. Orfanedes, Klayman & Associates, P.C., Washington, DC, for Plaintiff.

Susan G. Rosenthal, Jeffrey H. Weinberger, Winick & Rich, P.C., New York City, for Defendants.

## OPINION & ORDER

CHIN, District Judge.

In this case, I find myself in the position of having my fairness and impartiality as a judge called into question because of my race. After I ruled against their client at trial, respondents Larry Klayman, Esq. and Paul J. Orfanedes, Esq. directed a series of questions to me inquiring (1) whether I knew John Huang and Melinda Yee, individuals involved in the recent campaign finance controversy, and (2) whether I had had any "business, political or personal dealings" with them or any other "persons related in any way to the Clinton Administration." Respondents have since conceded on the record in open court that the questions were asked of me in part because of my race:

> THE COURT: You are standing there and you are telling me that you did not ask these questions of me because I am Asian–American, is that what you are telling me?
>
> MR. KLAYMAN: I'm saying that is part of it.
>
> THE COURT: You are conceding that that is part of it?
>
> MR. KLAYMAN: Part of it, yes. And I'm also asking the questions—
>
> THE COURT: You are conceding that you asked questions of the court, at least in part, because of my race?

MR. KLAYMAN: In part....

(12/19/96 Tr. at 8).

Respondents had absolutely no basis for posing such questions to the Court. Moreover, Mr. Klayman has engaged in other conduct disrespectful of the Court. For example, in the same hearing, after purporting to advise me of my obligations under the canons of judicial ethics, Mr. Klayman suggested that I "search [my] own soul." (12/19/96 Tr. at 14, 16).

Messrs. Klayman and Orfanedes are not members of the Bar of this Court. Rather, they were both granted the privilege of appearing pro hac vice.[1] Because of their conduct in this case, I issued an order directing them to show cause why they should not be sanctioned or disciplined for violating Disciplinary Rules 1–102(A)(5) and 7–106(C)(6). They retained counsel, who filed a written response on their behalf.

Having reviewed the response as well as all the relevant parts of the record, and for the reasons set forth below, I find that respondents Larry Klayman, Esq. and Paul J. Orfanedes, Esq. have violated Disciplinary Rules 1–102(A)(5) and 7–106(C)(6). Consequently, they are disciplined as follows: (1) their admissions pro hac vice are hereby revoked; (2) any future applications by Messrs. Klayman and Orfanedes to appear before me on a pro hac vice basis will be denied; and (3) Messrs. Klayman and Orfanedes are hereby ordered to provide a copy of this opinion to any other judge in this District to whom they may make an application for admission pro hac vice in the future.

### STATEMENT OF THE CASE

#### A. The Underlying Facts

Plaintiff Macdraw, Inc. ("Macdraw")[2] imports and sells wire-drawing equipment. In 1989, it agreed to sell certain equipment to Laribee Wire Manufacturing Company, Inc. ("Laribee") for a purchase price of approximately $7.1 million, to be paid in four installments. Because of the size of the transaction, Laribee approached defendant CIT Group Equipment Financing, Inc. ("CIT") for financing. CIT agreed to provide financing in return for a security interest in the equipment. Laribee was required, under the terms of the agreement, to meet certain conditions on a continuing basis. One such condition was that Laribee not be in default on any loans with other financial institutions.

Eventually, all of the equipment was delivered by Macdraw to Laribee. Consequently, CIT made the first three of the four payments under the financing agreement directly to Macdraw, as instructed by Laribee, leaving only the fourth and final installment—some $711,000—to be paid. In November 1990, Laribee acknowledged to CIT that it had "accepted" the equipment, clearing the way, from Macdraw's point of view, for the final payment. As CIT began processing the fourth installment, however, it learned that Laribee had defaulted on a loan with Bankers Trust. As a consequence, Laribee was in default under the financing agreement with CIT and CIT refused to release the final $711,000 to Macdraw. Laribee was not able to make the final payment itself. Hence, Macdraw was never paid the final $711,000.

#### B. Prior Proceedings

Macdraw commenced this action against CIT in August 1991, asserting five causes of action. Laribee was not named because it had filed for bankruptcy. Notwithstanding Laribee's inability to comply with the terms of its financing agreement with CIT, Macdraw contends that CIT was required to make the final $711,000 payment on Laribee's behalf because (1) defendant Richard Johnston purportedly made certain promises on CIT's behalf, and (2) CIT purportedly failed to disclose to Macdraw that Laribee was in default and encountering financial problems. CIT denied the allegations.

In the fall of 1991, respondent Klayman advised the Court (Kram, D.J.) of his inten-

---

1. Mr. Klayman was admitted pro hac vice in November 1991 by Judge Kram and Mr. Orfanedes was admitted pro hac vice by me in November 1996.

2. Macdraw is now known as Samp U.S.A (Trial Tr. at 23), but for ease of reference I will simply refer to it as Macdraw.

tion to move, on behalf of Macdraw, for summary judgment. Judge Kram sought to discourage Mr. Klayman from filing such a motion, to no avail, for in March 1992 Macdraw moved for partial summary judgment. On April 14, 1992, having failed to demand a jury trial on a timely basis, Macdraw also filed a motion for an order granting it a jury trial. Defendants thereafter cross-moved for summary judgment dismissing the complaint and seeking sanctions for Macdraw's purportedly frivolous motion practice.

By Memorandum Opinion and Order docketed January 18, 1994, Judge Kram: (1) denied plaintiff's motion for partial summary judgment; (2) denied plaintiff's request for a jury trial; (3) granted defendants' cross-motion to dismiss with respect to three of the five counts (leaving only the fraud and promissory estoppel claims for trial); and (4) granted defendants' cross-motion for sanctions. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 1994 WL 17952 (S.D.N.Y. Jan.18, 1994). Among other things, Judge Kram concluded "[i]t is apparent that 'plaintiff's counsel engaged in little or no preliminary factual and legal investigation' before bringing its motion." *Id.* at *20 (quoting *Wrenn v. New York City Health & Hospitals Corp.*, 104 F.R.D. 553, 559 (S.D.N.Y.1985)). The Court imposed sanctions under Rule 11, which Macdraw's attorneys were ordered to pay.

At an earlier point in the proceedings, Mr. Klayman wrote the Court a letter requesting leave to file a motion for voluntary recusal, pursuant to 28 U.S.C. § 455(a), on the ground that "the Court 'has prejudged the case against the plaintiff.'" *Id.* at *20 (quoting Letter to Hon. Shirley Wohl Kram from Larry Klayman of 5/14/92). Judge Kram reminded the parties that the Court had the power to impose sanctions for bad faith, vexatious, wanton, or oppressive conduct and directed the parties to submit proposed briefing schedule for a recusal motion. *Id.* at *20. No such motion, however, was ever filed.

On January 5, 1995, Macdraw, Klayman, and Klayman's firm (Klayman & Associates) appealed the imposition of sanctions to the Second Circuit. In an opinion dated January 3, 1996, the Second Circuit reversed the

award of sanctions. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253 (2d Cir.1996). In doing so, however, the Second Circuit noted:

> Our discussion should not be taken to suggest that we find the conduct of plaintiff's counsel throughout this litigation to be acceptable. Indeed, we note our sympathy with the district court's frustration; in pursuing this appeal, plaintiff's counsel submitted briefs that included inaccurate characterizations of the record and comments that we consider entirely inappropriate. There is no question that our rules permit sanctions where an attorney's conduct degrades the legal profession and disserves justice. In the face of significant abuse, a district court need not hesitate to impose penalties for unreasonable conduct and acts of bad faith. Nevertheless, it must do so with care, specificity, and attention to the sources of its power....

*Id.* at 1262.

While the appeal of the sanctions award was pending in the Second Circuit, Macdraw filed a "renewed motion" for a jury trial in the District Court. In the motion papers, signed by respondents Klayman and Orfanedes, respondents wrote:

> Macdraw respectfully submits that the Court has demonstrated perhaps an unintentional, yet readily apparent, predisposition against its claims. As set forth below, the record in this matter raises legitimate cause for concern. In order to alleviate any such concern, and avoid even the appearance of judicial predisposition, Macdraw respectfully requests that the Court allow a jury trial so as to safeguard Macdraw's rights....

(Pl. Mem. in Support of Renewed Motion for Jury Trial at 1). That motion was denied by Judge Kram on July 31, 1995. Thereafter, Macdraw filed with the Second Circuit a petition for a writ of mandamus directing the District Court to grant Macdraw a jury trial, which the Second Circuit denied on October 3, 1995.

By letter to Judge Kram dated October 30, 1995, Macdraw requested a stay of the case pending the filing of a petition for a writ of

certiorari to the Supreme Court on the issue of Macdraw's right to a jury trial. On November 2, 1995, Judge Kram granted the application and the case was stayed pending the filing by Macdraw of a petition for certiorari.

On November 6, 1995, the case was reassigned to me. Although it is not clear from the record whether Macdraw ever filed a petition for a writ of certiorari with the Supreme Court, in the summer of 1996 Macdraw advised the Court that it was prepared to proceed to trial without a jury. I conferenced the case on September 3, 1996, at which time I directed the parties to be ready for trial in November 1996.

## C. The Trial

After the submission of detailed trial briefs, the case was tried to the Court without a jury on November 6, 7, 12, and 13, 1996. Macdraw's principal witness was its president, Massimo Colella. After Macdraw rested, defendants moved for judgment as a matter of law and I reserved decision. (Trial Tr. at 302). Defendants proceeded to call two witnesses, including defendant Richard Johnston. At that point defendants renewed their motion for judgment as a matter of law, without resting. (Trial Tr. at 416). On November 12, 1996, I adjourned the trial so that I could complete my reading of the depositions before ruling on defendants' motion. (Id. at 425–33).

On November 13, 1996, I granted defendants' motion for judgment as a matter of law. Pursuant to Rule 52(c), I made findings of fact and conclusions of law. (Trial Tr. at 436–45). My decision turned largely on my credibility findings. Having heard both Johnston and Colella testify, and having reviewed all the evidence in the case, I found Johnston to be more credible than Colella. I accepted Johnston's testimony that he never made the alleged oral promises and I rejected Colella's testimony to the contrary. (Id. at 439–42). I also found that Macdraw could not have reasonably believed that CIT would commit to disbursing $711,000 in additional financing without assuring itself that Laribee was still in sound financial condition. (Id. at 444).

## D. Respondents' Conduct

Three aspects of respondents' conduct, taken together, led me to issue the order to show cause. They are: (1) comments made by Mr. Klayman at the conclusion of trial on November 13, 1996; (2) the questions contained in a letter dated December 9, 1996, signed by both Messrs. Klayman and Orfanedes; and (3) comments made by Mr. Klayman at a conference I held on December 13, 1996, after receiving the December 9th letter. I will review each in detail.

### 1. The November 13, 1996 Comments

After I stated my findings and conclusions at the conclusion of the trial on November 13, 1996, Mr. Klayman expressed a desire to make post-trial motions. A colloquy with the Court ensued (Trial Tr. at 445–52), concluding with the following:

> [THE COURT TO MR. KLAYMAN:] I am not going to debate this with you. I have ruled. . . .
>
> I really don't think any additional motions are really going to help. All I am suggesting to you is that I think your view of the evidence is very different from my view of the evidence and that's fine. You have to do your job. If you want to make any motions, go ahead and make your motions, but I am not going to require any responses from CIT until I look at the motions first.
>
> MR. KLAYMAN: Your Honor, I understand your position and I understand you have denied the motions. We will simply file a notice of appeal. But I had to say that for the record. We are not here 6 years later because we wanted to be. You are newly appointed to the bench, we are aware of the fact that you did speed this case to trial. We hope in the future this court functions better because frankly it has not functioned well—
>
> THE COURT: Mr. Klayman, that is totally out of line. I don't know what you are doing now. I have no history with you.
>
> MR. KLAYMAN: What I am telling you is, you criticized us for being 6 years later into this case and I am pointing out that

we would have liked to have tried this case a lot sooner, period. I'm not trying to embarrass you or anybody else.

THE COURT: Believe me, you are not embarrassing me. This case is five or six years old for whatever the reason. When it came to me I moved it very quickly. Your client got his day in court. That's it. For you to stand there and criticize the court gets you nowhere. I just don't understand why you are doing that. How does it help you to stand there and criticize the court?

MR. KLAYMAN: Because I am an officer of the court and I take it seriously. And criticism goes both ways. There is a First Amendment, your Honor.

THE COURT: Mr. Klayman, is there anything else you want to say?

MR. KLAYMAN: No.

THE COURT: Then this case is over.

(Trial Tr. at 451–52) (emphasis added).

### 2. *The December 9, 1996 Letter*

Unfortunately, however, the case was not over. Some four weeks later, I received a letter, dated December 9, 1996 (the "December 9th Letter"), addressed to me and signed by both Messrs. Klayman and Orfanedes, which stated in part:

> Finally, as you may know, Mr. Orfanedes and I have been involved in very highly publicized and significant public interest litigation, *Judicial Watch, Inc. v. U.S. Department of Commerce,* Case No. 95–0133(RCL) (D.D.C.), which involves a Mr. John Huang, Ms. Melinda Yee and other persons in the Asian and Asian–American communities. *See* Exhibit 1. Recently, we came upon a document in this case which mentions your name in the context of other prominent Asian–American appointees of the Clinton Administration. *See* Exhibit 2. Accordingly, could you please formally advise us whether you know either of these individuals, as well as what relationship, contacts, and/or business, political or personal dealings, if any, you have had with them, or persons related in any way to the Clinton Administration. Please also advise us if you had seen the enclosed or similar newspaper articles

or press accounts before this case was tried on November 6, 7, 12 and 13, 1996. Attached as Exhibit 1 to the December 9th Letter were eight articles from magazines and newspapers reporting on the recent controversy regarding John Huang, the Democratic National Committee, and campaign contributions. Mr. Klayman is mentioned in some of the articles. Exhibit 2 to the December 9th Letter is a computer-generated print-out of a newspaper or magazine article that appeared on November 4, 1994, more than two years ago, in which certain presidential appointments of Asian–Americans are listed, including John Huang and myself.

### 3. *The December 19, 1996 Comments*

After receiving the December 9th Letter, I directed counsel to appear for a conference at which I asked respondents to explain the basis on which they felt it was appropriate to ask me the questions contained in their Letter. Mr. Klayman spoke on their behalf and articulated the view that they asked the questions because: (1) they felt I had made some comments directed toward them that were critical and "in some way personal"; (2) they were involved in a case against the Commerce Department and the Clinton Administration in which they had been accused of being biased against the Asian–American community; and (3) I was a recent appointee of the Clinton Administration and had been actively involved, prior to taking the bench, with the Asian American Legal Defense and Education Fund and the Asian American Bar Association of New York. (12/19/96 Tr. at 4–9). Mr. Klayman then said the following to me:

> I frankly felt, and Mr. Orfanedes frankly felt, that the remarks in some way were personal, and we are concerned, as advocates on behalf of our client, given the unusual nature of this case concerning Mr. Huang, that somehow subjectively this did not in any way influence you or perhaps have you view me negatively or Mr. Orfanedes.

(12/19/96 Tr. at 6).

To the extent there was any doubt that the questions in respondents' December 9th Letter were asked of me in part because of my

race, that doubt was eliminated by Mr. Klayman's responses to my questions:

> THE COURT: ...
>
> What I hear is that you are asking questions of me because you have some questions about my fairness and impartiality because of my race. Is that not so?
>
> MR. KLAYMAN: No, that's not so, your Honor.
>
> THE COURT: Would you have asked me these questions if I were not Asian–American?
>
> MR. KLAYMAN: I might have.
>
> ...
>
> THE COURT: You would have asked me these questions if I were Caucasian or African–American?
>
> MR. KLAYMAN: Let me tell you why I might have. And I don't see any harm in asking these questions because I have a duty to a client.
>
> THE COURT: Did your client ask you to ask these questions of me?
>
> MR. KLAYMAN: My client is aware of the general issues. They did not ask me to ask these questions of you.
>
> Frankly, your Honor, given whatever your response may be, I don't know that there's any issue here at all, but I felt that asking the question was something that would be prudent and wise and part of my responsibility to represent our client zealously within the balance of the law.
>
> It's not your race. I myself am a minority. I myself have been subject to discrimination. I am sensitive to that.
>
> THE COURT: You are standing there and you are telling me that you did not ask these questions of me because I am Asian–American, is that what you are telling me?
>
> MR. KLAYMAN: I'm saying that is part of it.
>
> THE COURT: You are conceding that that is part of it?
>
> MR. KLAYMAN: Part of it, yes. And I'm also asking the questions—
>
> THE COURT: You are conceding that you asked questions of the court, at least in part, because of my race?
>
> MR. KLAYMAN: In part. And let me tell you why. And I would [have] asked questions because you're also a recent appointee of the Clinton Administration. Has nothing to do with it. But you have been active, your Honor, for instance, in these kinds of efforts. And I commend you for your activity on behalf of Asian–Americans, with regard to the Asian–American Legal Defense Fund and being a president of the Asian–American Bar Association. I myself have been active in similar types of things and am fully supportive of those activities.
>
> But we are all human, and sometimes, sometimes subjective criteria can unwittingly, no matter how ethical, no matter how decent, no matter how honest someone is—and we believe you to be that—they can subjectively influence our decision-making. I, for instance, would not sit as a Jewish American on a case that involved a Palestinian. I wouldn't do it if I was a judicial officer just because of a lot of things which enter into the subjectivity of all our thinking.
>
> I'm not making any accusations, but I felt that I had a right, given what—
>
> THE COURT: Based on what? Based on what did you have that right?
>
> MR. KLAYMAN: Representing the client. We live in the real world, your Honor. People are influenced by subjective criteria.

(12/19/96 Tr. at 7–9).

Mr. Klayman articulated the view that he was simply asking questions of the Court, that he was not making accusations, and that there was no harm in asking the questions. (12/19/96 Tr. at 9–12). Mr. Orfanedes spoke briefly and stated that he did not "see this as necessarily race-based." (*Id.* at 12). Mr. Klayman then purported to advise me on the canons of judicial ethics (*id.* at 14) and eventually suggested that I "search [my] own soul":

> [MR. KLAYMAN:] Now, I believe your Honor has to search his own soul to a large extent. There may be independent legal requirements here on whether or not you wish to advise this court of some of the questions which we asked, which are be-

nign, which were posed in a very respectful way. We ask that this letter [the December 9th letter] be made part of the court record.

THE COURT: The letter has already been docketed. I am not going to search my soul. I do not need to do any soul searching at all. The letter is offensive. I find the letter to be offensive. I do not think it is benign nor do I think it is respectful. Not at all.

MR. KLAYMAN: I take it your Honor is not going to respond to the questions.

THE COURT: I am not going to respond to your questions. I have heard no basis that would give me any reason to answer your questions.

(12/19/96 Tr. at 16).

### E. *The Order To Show Cause*

On January 10, 1997, in accordance with General Rule 4 of the Court, and in particular paragraphs (f), (g), and (k) thereof, I ordered Messrs. Klayman and Orfanedes to show cause why they should not be sanctioned or disciplined for violating Disciplinary Rules 1–102(A)(5) and 7–106(C)(6) by their conduct in this case on November 13, 1996 and December 19, 1996 and their December 9th Letter.

Respondents retained counsel, who submitted a letter brief dated January 24, 1997 (the "Letter Brief") on respondents' behalf. In the Letter Brief, respondents essentially argue that their conduct could not prejudice the administration of justice or degrade a tribunal. In addition, respondents contend that they acted reasonably in sending the December 9th Letter because of the "notoriety" surrounding their lawsuit against the Department of Commerce, which focused on "a prominent Presidential appointee, John Huang, who is Asian–American," their involvement in the lawsuit, and what they believed to be my hostility toward them personally. (Letter Br. at 5–6). The Letter Brief further states:

Mr. Klayman and Mr. Orfanedes became concerned that because the Court was a recent appointee of President Clinton and Mr. Huang was a principle [sic] advisor on Asian–American appointments and fund raising and Mr. Klayman had been prominently mentioned in the media for his role in the Commerce Department case, which focused in part on the White House, the Democratic National Committee, John Huang, Melinda Yee, and other persons in the Asian and Asian–American communities, and because the lawsuit had elicited such angry responses from the White House, Democrats and the Asian–American community, *that the Court might be angry at them and unable to be fair and impartial in a case in which they were counsel* . . . .

(Letter Br. at 8–9) (emphasis added). Respondents also contend in the letter that they did not ask the questions because of any concern that I was biased because of my race, and state that they "strive to be free of racial prejudice and believe they are." (Letter Br. at 10–11).

Finally, respondents contend in the Letter Brief that no further action is required, but that if the Court believes otherwise, "further identification of the issues, facts and law involved would be necessary." In that event, they request that the matter be referred to another judge of this Court. (Letter Br. at 12–13).

### DISCUSSION

### A. *Procedural Issues*

Rule 4 of the General Rules of this Court governs the discipline of attorneys. Attorneys are entitled to notice and an opportunity to be heard. Gen. Rule 4(f). If, after such notice and opportunity, they are found guilty by clear and convincing evidence of violating the Code of Professional Responsibility, they may be disciplined. *Id.* In the case of an attorney admitted pro hac vice, discipline may include censure, suspension, or an order "precluding the attorney from again appearing at the bar of this court." Gen. Rule 4(g). In addition, "[u]pon the entry of an order of preclusion, the clerk shall transmit to the court or courts where the attorney was admitted to practice a certified copy of the order, and of the court's opinion, if any." *Id.*

Where misconduct occurs in the presence of a judge of this Court or "in respect to any matter pending in this [C]ourt," the matter "may be dealt with directly by the judge in charge of the matter or at said judge's option referred to the committee on grievances, or both." Gen. Rule 4(k).

Here, respondents raise three procedural issues: (1) whether further action is required; (2) if so, whether the proceedings should be delayed for "further identification of the issues, facts and law"; and (3) whether the matter should be referred to another Judge of the Court. (Letter Br. at 12–13).

As to the first procedural issue, for the reasons stated herein, I believe further action is required.

As to the second procedural issue, respondents have been provided with notice and an opportunity to be heard. Indeed, they were given two opportunities to explain why they asked the questions contained in the December 9th Letter. Moreover, my order to show cause specified that I was concerned about their conduct on November 13 and December 19, 1996 and their December 9th Letter, and it further specified the two Disciplinary Rules that I believed were implicated. Hence, there is no need for "further identification of the issues, facts and law involved."

Finally, as to the third procedural issue, respondents request that the matter be referred to another Judge of this Court. The misconduct, however, occurred both in my presence and "in respect to" a matter pending before me. Thus, I have the option of dealing with the matter "directly." I choose to do so.

## B. *The Applicable Disciplinary Rules*

Two Disciplinary Rules of the Code of Professional Responsibility (*see* Appendix to N.Y. Judiciary Law (McKinney 1992 & Supp. 1997)) must be considered. They are DR 1–102(A)(5) and DR 7–106(C)(6).

DR 1–102(A)(5) provides that:

A lawyer shall not ... [e]ngage in conduct that is prejudicial to the administration of justice.

Disciplinary Rule 7–106(C)(6) provides that:

In appearing as a lawyer before a tribunal, a lawyer shall not ... [e]ngage in undignified or discourteous conduct which is degrading to a tribunal.

Hence, the issue presented is whether the record shows, by clear and convincing evidence, that respondents engaged in conduct that was "prejudicial to the administration of justice" or that was "undignified or discourteous" and "degrading to a tribunal."

Fortunately, the case law on the subject of whether attorneys violated their ethical obligations by their conduct toward courts is sparse. It is clear, however, that attorneys who engage in disrespectful conduct against courts are subject to discipline.

For example, in *In re Evans*, 801 F.2d 703 (4th Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987), an attorney was disbarred by the district court for accusing a magistrate judge of either being incompetent or having a "Jewish bias" in favor of an adversary. *Id.* at 704. The district court found that the attorney had, by his conduct, violated DR 1–102(A)(5), 7–106(C)(6), and 8–102(B).[3] *Id.* at 705.

The attorney appealed, and the Fourth Circuit affirmed, concluding, among other things, that the attorneys' accusations against the magistrate of incompetence and religious and racial bias were "unquestionably undignified, discourteous, and degrading." *Id.* at 706. Moreover, the Fourth Circuit found that because the accusations were made while the underlying case was on appeal, the district court properly viewed the accusations as "an attempt to prejudice the administration of justice in the course of the litigation." *Id.*

In *People ex rel. Chicago Bar Ass'n v. Metzen*, 291 Ill. 55, 125 N.E. 734 (1919), an attorney was disbarred for writing a letter to a judge stating that the attorney "was usual-

---

**3.** DR 8–102(B) prohibits a lawyer from making false accusations against a judge. Respondents have disavowed that they were making any accu-

sations against me. Although the point is debatable, I have chosen not to invoke DR 8–102(B).

ly engaged in dealing with men and not irresponsible political manikins or appearances of men." *Id.* at 735. The Illinois Supreme Court wrote:

> Judges are not exempt from just criticism, and whenever there is proper ground for serious complaint against a judge, it is the right and duty of a lawyer to submit his grievances to the proper authorities, but the public interest and the administration of the law demand that the courts should have the confidence and respect of the people. Unjust criticism, insulting language, and offensive conduct toward the judges personally by attorneys, who are officers of the court, which tend to bring the courts and the law into disrepute and to destroy public confidence in their integrity, cannot be permitted.

*Id.* at 735. *See also In re Greenfield*, 24 A.D.2d 651, 262 N.Y.S.2d 349, 350 (2d Dep't 1965) (suspending one attorney and disbarring another for writing a letter to a judge falsely accusing the judge of misconduct in office); *Kentucky Bar Ass'n v. Williams*, 682 S.W.2d 784, 786 (Ky.1984) (suspending attorney for three months for deliberately failing to appear for court appearance and for writing disrespectful letter to the trial judge and holding "[d]eliberately disrespectful actions toward the judiciary cannot help but tend to bring Bench and Bar into disrepute").

■ The source of a court's power to discipline an attorney for misconduct is clear. As the Supreme Court has held,

> Courts have long recognized an inherent authority to suspend or disbar lawyers.... This inherent power derives from the lawyer's role as an officer of the court which granted admission.

*In re Snyder*, 472 U.S. 634, 643, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985); *accord In re Jacobs*, 44 F.3d 84, 87 (2d Cir.1994) ("A district court's authority to discipline attorneys admitted to appear before it is a well-recognized inherent power of the court."), *cert. denied*, 516 U.S. 817, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995); *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 470–71, 162 N.E. 487 (1928) (" 'Membership in the bar is a privilege burdened with conditions.' [An attorney is] received into that ancient fellowship for

something more than private gain. He [becomes] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.") (citations omitted). This power extends as well to out-of-state attorneys who are granted the privilege of appearing pro hac vice: "Just as with a regularly admitted attorney, one seeking admission pro hac vice is subject to the ethical standards and supervision of the court." *In re Rappaport*, 558 F.2d 87, 89 (2d Cir.1977); *see also Leis v. Flynt*, 439 U.S. 438, 441–42, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979) (ability of an out-of-state attorney to appear *pro hac vice* is a "privilege" and "not a right granted either by statute or the Constitution").

### C. *Respondents' Conduct*

■ I find, by clear and convincing evidence, that respondents, and in particular Mr. Klayman, engaged in undignified and discourteous conduct that was both degrading to the Court and prejudicial to the administration of justice. That conduct includes the following:

#### 1. *The November 13, 1996 Comment*

Mr. Klayman stated on November 13, 1996 that "[w]e hope in the future this court functions better because frankly it has not functioned well ...." (Trial Tr. at 451). This comment was undignified, discourteous, and degrading to the Court. Although respondents now contend that this comment "was not referring to the period after the case was reassigned," nonetheless, the comment was not made in a constructive manner and was degrading to the Court as a whole. (Letter Br. at 3).

In fact, a review of the court file shows that whatever delay there was in the case was largely attributable to Macdraw and its counsel. For example, Macdraw did not make a timely jury demand; as a consequence, it filed a motion for a jury trial, a renewed motion for a jury trial, a petition for a writ of mandamus requiring the district court to grant a jury trial, and a petition for rehearing en banc—all of which were unsuccessful. Ultimately, Macdraw requested and was granted a stay of the proceedings so that it could file a petition for certiorari to the

Supreme Court. In addition, although it had no realistic chance of winning a summary judgment motion as the plaintiff in a case that turned on a disputed oral promise, it nonetheless filed such a motion, which led to a cross motion for sanctions and further litigation, including appellate litigation. All of these actions—as well as others by Macdraw and its attorneys—served to prolong the proceedings.

### 2. The December 9th Letter

The questions contained in the December 9th Letter were inappropriate and were asked in an undignified and disrespectful manner. They were asked, as respondents concede, in part because I am Asian–American. They were asked because respondents were concerned that because I had been active with the Asian American Legal Defense and Education Fund and the Asian American Bar Association of New York before I took the bench and they had been involved in litigation that involved some individuals who happened to be Asian–American, I "might be angry at them and unable to be fair and impartial in a case in which they were counsel." (Letter Br. at 8–9).

In essence, respondents were suggesting that a judge might be "angry" at them and therefore unable to treat them fairly merely because (1) the judge was Asian–American and (2) they were involved in what some apparently have perceived to be "anti-Asian" litigation. This sentiment is absurd and demeans me individually and the Court as a whole. In fact, I was not aware, until it was brought to my attention in the December 9th Letter, that Mr. Klayman and Mr. Orfanedes had any connection to any litigation involving the John Huang fund-raising controversy.

Mr. Klayman's comment that if he were a "judicial officer" he "would not sit as a Jewish American on a case that involved a Palestinian" (12/19/96 Tr. at 9) is most telling. Judges cannot recuse themselves solely on the basis of their race or religion or the race or religion of the attorneys or parties who come before them. As Judge Motley wrote more than 20 years ago in denying a motion for her recusal in a sex discrimination case

brought by a female attorney against a law firm:

> It is beyond dispute that for much of my legal career I worked on behalf of blacks who suffered race discrimination. I am a woman, and before being elevated to the bench, was a woman lawyer. These obvious facts, however, clearly do not, ipso facto, indicate or even suggest the personal bias or prejudice required [for recusal]. The assertion, without more, that a judge who engaged in civil rights litigation and who happens to be of the same sex as a plaintiff in a suit alleging sex discrimination on the part of a law firm, is, therefore, so biased that he or she could not hear the case, comes nowhere near the standards required for recusal. Indeed, if background or sex or race of each judge were, by definition, sufficient grounds for removal, no judge on this court could hear this case, or many others, by virtue of the fact that all of them were attorneys, of a sex, often with distinguished law firm or public service backgrounds.

*Blank v. Sullivan & Cromwell,* 418 F.Supp. 1, 4 (S.D.N.Y.1975). *See also Commonwealth of Pennsylvania v. Local Union 542, IUE,* 388 F.Supp. 155, 163 (E.D.Pa.), *aff'd,* 478 F.2d 1398 (3d Cir.1973), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975) (Higginbotham, J.) (denying defendant's motion to disqualify judge from hearing race discrimination claim, on basis of his race and comments he made in speech to "group composed of black historians," and holding "that one is black does not mean, ipso facto, that he is anti-white; no more than being Jewish implies being anti-Catholic, or being Catholic implies being anti-Protestant").

### 3. The December 19, 1996 Comments

Mr. Klayman's lack of respect for the Court continued on December 19, 1996. After he admitted that the questions in the December 9th Letter were asked of me in part because of my race (12/19/96 Tr. at 7–9), he presumed to advise me on my ethical obligations under the canons of judicial ethics. (*Id.* at 14, 16–17). He took it upon himself to suggest that "your Honor has to search his own soul to a large extent." (*Id.*

at 16). These comments went beyond mere arrogance and foolishness and were undignified, discourteous, and degrading to the Court.

### D. Respondents' Claim of Hostility

In an effort to rationalize their behavior, respondents contend that they were concerned about my fairness and impartiality because comments that I made led them to believe that I "had become hostile to them personally." (Letter Br. at 6). They cite to a number of specific instances, including my reference to their "abusive and onerous [sic] questioning in the depositions" (Letter Br. at 6 (citing Trial Tr. at 444)); my characterization of one of plaintiff's theories as "preposterous" (id.); my reliance on the failure of Macdraw to have made a demand on CIT before bringing suit (id.); my reaction to plaintiff's stated intention to file post-trial motions and my reference to plaintiff's attorneys' fees (id. at 448). To the extent I expressed any impatience, it was not due to any personal bias against respondents; rather, it was the result of a bias against questionable lawyering, the taking of specious positions, and the wasting of resources of the parties and the Court.

#### 1. The Depositions

Respondents complain that "the Court spoke of 'very abusive and onerous questioning in the depositions' by plaintiff's counsel without identifying it." (Letter Br. at 6 (citing Trial Tr. at 444)). Not only is my statement misquoted, it is also taken out of context. The complete and accurate statement was as follows:

I also note, by the way, that having read the depositions I am convinced that there was no effort on the part of CIT to defraud Macdraw or even to take advantage of Macdraw. *To the contrary, I found the CIT witnesses to be frank and forthright in the face of some very abusive and obnoxious questioning in the depositions.*

(Trial Tr. at 444) (emphasis added). Moreover, Mr. Klayman's questioning at the depositions was indeed "abusive and obnoxious" at times. For example, at the deposition of John Zakoworotny, he stated to the witness:

"It [the question] calls for a yes or no. Don't play around with the questions. Give me a yes or no.... Tell me yes or no. This is not an exercise in your evading my question." (Zakoworotny Dep. at 67–68). When the witness later stated that he could not answer a question about a document based on his "initial review," Mr. Klayman responded: "You want to review it more thoroughly? Read it five times." (Id. at 78). When the witness tried to answer another question by providing an explanation, Mr. Klayman chastised him as follows:

Just answer the question. I think you've had too much preparation. Just answer the question. And I put "preparation" in quotes. You're tied like a pretzel. Just answer the question.

(Id. at 81–82). There are numerous other examples. (See, e.g., Zakoworotny Dep. at 44–45, 56–57, 60–61, 67–68, 71, 83, 86, 90–91, 97; Swallwell Dep. at 21–22, 40–41).

#### 2. Plaintiff's "Preposterous" Claim

I did describe one of Macdraw's theories as being "preposterous" (Trial Tr. at 444), and indeed it was. Macdraw was contending that a relatively low-level employee, who had been employed by CIT at that point for only five months, was conspiring with others at CIT to cheat Macdraw by lulling it into providing services to Laribee to enhance the value of equipment that CIT could later seize as security and re-sell at a higher price when Laribee defaulted. The only motive that Macdraw could offer for why Johnston would engage in this conspiracy to defraud was that he hoped to improve his chances of being promoted. The notion that a low level employee would see perpetuating a fraud as a means to obtain a promotion is indeed preposterous.

#### 3. The Absence of a Demand

In my findings of fact and conclusions of law, I observed that "[i]t is also significant that Macdraw never, prior to this lawsuit, ever made a demand on CIT or communicated its belief that CIT had made a promise or guarantee that it refused to honor." (Trial Tr. at 444). Respondents claim that this observation further demonstrates my hostili-

ty toward them because my observation (1) was purportedly based on "an error of fact," citing PX 133, and (2) in any event was "irrelevant." (Letter Br. at 6). Respondents are wrong in both respects.

First, PX 133 hardly constitutes a "demand" letter or a communication from Macdraw to CIT setting forth a claim that CIT had made a promise or guarantee that it refused to honor. Rather, the January 29, 1991 letter from counsel for Macdraw simply asks Mr. Zakoworotny of CIT to "contact [the attorney] regarding certain issues that [Macdraw] needs to address promptly re[g]arding the balance due." (PX 133). In contrast, Mr. Colella, the President of Macdraw, testified in response to the Court's questions that Macdraw had not communicated to CIT, before bringing the lawsuit, its belief that CIT had made and failed to honor such a promise. (Trial Tr. at 145–46; *see also id.* at 142–43). Hence, the record shows that no demand was made prior to suit being filed.

Second, the issue of whether Macdraw had made its view known to CIT before the filing of suit was relevant. Macdraw's failure to make such a demand supports CIT's contention that the claim lacks any merit and that, as a factual matter, Macdraw did not actually believe that any promise had been made by CIT to Macdraw. Significantly, when CIT's counsel commenced this line of inquiry on cross-examination of Mr. Colella, Macdraw's counsel did not object. (Trial Tr. at 142–46).

### 4. *Post-Trial Motions and Attorneys' Fees*

Respondents also find evidence of my "hostility" toward them in my response to their stated desire to make post-trial motions and my comments on what they describe as "irrelevant issues like the reasonableness of their attorneys fees." (Letter Br. at 6). Apparently to show the reasonableness of their fees, respondents point to the fact that defendants incurred some $355,654 in legal fees. (*Id.* at 7).

My comments, however, reflect no bias. First, the issue of Macdraw's attorneys' fees was raised on cross-examination of Mr. Colella. Again, there was no objection to this line of inquiry. (Trial Tr. at 173–74). Second, my concern was not with whether the fees that Macdraw had already paid were reasonable for the services rendered or whether services were actually rendered. Rather, I was concerned that Macdraw had already spent more than $300,000 on a claim that, in my view, never had much chance of succeeding. I was also concerned that $300,000 in fees had been spent on a claim based on CIT's refusal to provide $711,000 in financing. Furthermore, I was concerned that Macdraw would be billed even more fees for post-trial motions that had little, if any, chance of success—indeed, post-trial motions in a non-jury case in which detailed pre-trial briefs had been filed (*see* Trial Tr. at 8–9) and where the outcome had turned almost entirely on issues of credibility. Indeed, my comments were made in the following context:

MR. KLAYMAN: I understand your Honor's decision, and I'm not going to use that forum as an opportunity to re-argue that. We will be moving with post-trial motions accordingly. We feel that your Honor will have an open mind once you have had a chance [t]o look at this in a full perspective.

THE COURT: What post-trial motions are we talking about? This case has gone on for 5 years. This [is] not a jury case where I have to consider if there was evidence to support the jury's verdict. I'm not going to grant any post-trial motions.

I granted the defendants' motion for judgment as a matter of law. What motions do you propose to make? One of the things that troubles me, frankly, is Mr. Colella testified that he spent $300,000 in legal fees on this case. Frankly, I don't understand it. . . .

(Trial Tr. at 447–48).

The fact that CIT also spent some $355,000 in fees certainly does not help respondents. If anything, by the time this case is completed, the parties together would have spent more in legal fees than the $711,000 in financing in question.

## E. *The Administration of Justice*

In determining whether respondents have engaged in improper conduct, it is important to consider two issues that are raised by their arguments: First, to what extent do lawyers have an obligation to question the impartiality of judges? Second, what harm is there in asking?

Lawyers do have an obligation to inquire when they have a reasonable basis for believing that a judge might not be fair and impartial. But there must be a reasonable basis. *In re Evans,* 801 F.2d 703, 705–06 (4th Cir. 1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987); *People ex rel. Chicago Bar Ass'n v. Metzen,* 291 Ill. 55, 125 N.E. 734, 735 (1919). And where there is a reasonable basis for doing so, there is no harm in asking—as long as the "asking" is done in a discreet, dignified, and respectful way. If a lawyer has a reasonable basis for inquiring about a judge's ability to be impartial, the attorney might, for example, request a pretrial conference to explain the circumstances and to ask the Court whether the Court believes there is any reason it ought not to hear the particular case. But where there is no reasonable basis for questioning a judge's impartiality, or where the questioning is done in an undignified and disrespectful manner, there is harm in asking, for the integrity of the Court is challenged, the administration of justice is prejudiced, and both the bar and the bench are degraded.

Here, respondents had no reasonable or good faith basis to question my fairness and impartiality. Rather than acknowledge that fact and apologize for their actions, they instead have resorted to mischaracterizing and misrepresenting the record in an effort to justify their actions. The record does not, however, provide the justification they seek.

Moreover, instead of raising the issue discreetly and respectfully, they confronted me with what was tantamount to a series of written interrogatories, including: "could you please formally advise us whether you know either of these individuals, as well as what relationship, contacts and/or business, political or personal dealings, if any, you have had with them, or persons related in any way to the Clinton Administration." They asked for my "immediate attention to this matter," and noted that a deadline was approaching for any post-trial motions. This was followed by further disrespectful conduct, including urging me to "search [my] own soul."

Significantly, Mr. Klayman has a history of accusing judges of bias or prejudging cases. In this case, although he claims they are not accusations, he has raised questions about my ability to be fair. He accused Judge Kram of prejudging the case against plaintiff and of having "perhaps an unintentional, yet readily apparent, predisposition against its claims." And in 1992, in a case in the United States District Court for the Central District of California, Mr. Klayman accused a judge of being anti-Asian and anti-semitic and having "prejudged" the case. *See Baldwin Hardware Corp. v. Franksu Enter. Corp.,* 78 F.3d 550, 555 (Fed.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). Mr. Klayman's repeated efforts to find fault with the judges before whom he appears certainly interferes with the administration of justice. *Cf. In re Snyder,* 472 U.S. 634, 647, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985) ("a single incident of rudeness or lack of professional courtesy . . . does not support a finding of contemptuous or contumacious conduct, or a finding that a lawyer is 'not presently fit to practice law in the federal courts' ").

Mr. Klayman has also been sanctioned on prior occasions, including by Judge Kram in this case. Although the Second Circuit reversed the award of sanctions (largely on procedural grounds), it noted in its opinion that "in pursuing this appeal, plaintiff's counsel submitted briefs that included inaccurate characterizations of the record and comments that we consider entirely inappropriate." 73 F.3d at 1262.

Mr. Klayman was also sanctioned in the *Baldwin* case in 1992. The trial judge, because of his belief that Mr. Klayman had acted in bad faith and made certain misrepresentations, permanently and prospectively barred Mr. Klayman from appearing before him again pro hac vice and required him to attach a copy of the court's order to any future pro hac vice application in that court.

**460**

78 F.3d at 561–62. In particular, the trial judge found that Mr. Klayman had represented to the court, when he applied for admission pro hac vice, that he had never been sanctioned before when, in fact, his former firm, Klayman & Gurley, P.C., had been sanctioned in a matter handled by Mr. Klayman and two other attorneys at the firm. *Id.* at 562. The Federal Circuit affirmed, holding, among other things, that the trial judge had not abused his discretion in finding misconduct on the part of Mr. Klayman and his firm. *Id.*

Mr. Klayman and his current firm were also sanctioned $1,500 in *Wire Rope Importers' Ass'n v. United States,* 1994 WL 235620, 18 C.I.T. 478 (CIT 1994), for making a "frivolous" filing and for raising arguments that "stood no chance of success." *Id.* at *6–7.

Mr. Orfanedes is certainly less culpable than Mr. Klayman. The comments about which I am concerned were made not by him but by Mr. Klayman. Moreover, Mr. Orfanedes does not appear to have a history of this type of conduct as does Mr. Klayman. Nonetheless, Mr. Orfanedes signed the letter, was present when Mr. Klayman made the comments, and effectively joined in them. Hence, he must be held accountable as well.

### CONCLUSION

As noted above, in reversing the prior award of sanctions against plaintiffs' counsel in this case, the Second Circuit wrote:

There is no question that our rules permit sanctions where an attorney's conduct degrades the legal profession and disserves justice. In the face of significant abuse, a district court need not hesitate to impose penalties for unreasonable conduct and acts of bad faith.

73 F.3d at 1262. Respondents have engaged in significant abuse, unreasonable conduct, and acts of bad faith. Their conduct has degraded the legal profession and disserved justice.

Accordingly, it is hereby ORDERED as follows:

(1) the admissions of Larry Klayman, Esq. and Paul J. Orfanedes, Esq. pro hac vice are hereby revoked; hence, if there are any further proceedings in this case in this Court, Macdraw will be required to retain new counsel;

(2) any future applications by Messrs. Klayman and Orfanedes to appear before me on a pro hac vice basis will be denied;

(3) Messrs. Klayman and Orfanedes shall provide a copy of this opinion to any other judge in this District to whom they may make a future application for admission pro hac vice; and

(4) The Clerk of the Court shall transmit to the courts where Messrs. Klayman and Orfanedes are admitted (as set forth in their applications for admission pro hac vice) a certified copy of this Opinion and Order.

SO ORDERED.